## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EMPRESS CASINO JOLIETCORPORATION, )
an Illinois corporation, DES PLAINES )
DEVELOPMENT LIMITED PARTNERSHIP, )
an Illinois limited partnership, d/b/a Harrah's )
Casino Cruises Joliet, HOLLYWOOD )
CASINO-AURORA, INC., an Illinois )
corporation, and ELGIN RIVERBOAT )
RESORT-RIVERBOAT CASINO, an Illinois )
general partnership d/b/a GRAND VICTORIA )
CASINO, )
                    )
           Plaintiffs, )
                    )
      vs. )
                    )
ROD BLAGOJEVICH, FRIENDS OF )
BLAGOJEVICH, JOHN JOHNSTON, )
BALMORAL RACING CLUB, INC., )
MAYWOOD PARK TROTTING )
ASSOCIATION, INC., ARLINGTON PARK )
RACECOURSE, LLC, FAIRMOUNT PARK, )
INC., HAWTHORNE RACE COURSE, INC. )
                    )
           Defendants. )

Case No.:

**JURY TRIAL DEMAND**

```
FILED: JUNE 12, 2009
09CV3585
JUDGE KENNELLY
MAGISTRATE JUDGE COX
BR
```

## <u>COMPLAINT</u>

Plaintiffs Empress Casino Joliet Corp.; Des Plaines Development Limited Partnership, an

Illinois limited partnership, d/b/a Harrah's Casino Cruises Joliet; Hollywood Casino-Aurora,

Inc., an Illinois corporation; and Elgin Riverboat Resort-Riverboat Casino, an Illinois general

partnership d/b/a Grand Victoria Casino (the "Casinos"), by and through their undersigned

counsel, and for their Complaint against Defendants Rod Blagojevich ("Blagojevich"), Friends

of Blagojevich, John Johnston ("Johnston"), Balmoral Racing Club, Inc. ("Balmoral Park"),

Maywood Park Trotting Association, Inc. ("Maywood Park"), Arlington Park Racecourse, LLC

("Arlington Park"), Fairmount Park, Inc. ("Fairmount Park"), and Hawthorne Race Course, Inc.

("Hawthorne") hereby state and allege as follows:

## NATURE OF ACTION

1.      Throughout his administration, former Illinois Governor Rod Blagojevich put the Office of the Governor of Illinois and indeed the Illinois government itself, up for sale.  Rod Blagojevich used his office and the power entrusted to him to enrich himself and his co-conspirators without regard for the interests of Illinois' honest citizens.  After Blagojevich was arrested by agents of the Federal Bureau of Investigation in December 2008 on federal corruption charges, the United States Attorney ("U.S. Attorney") for the Northern District of Illinois Patrick Fitzgerald described the breadth of Blagojevich's corruption as "staggering." Fitzgerald explained, "Blagojevich put a 'for sale' sign on the naming of a United States Senator; involved himself personally in pay-to-play schemes with the urgency of a salesman meeting his annual sales target; and corruptly used his office in an effort to trample editorial voices of criticism."   The evidence collected during the U.S. Attorney's criminal investigation of Blagojevich, including wire tap recordings, demonstrates that the core of Blagojevich's corruption was a scheme to obtain campaign contributions in exchange for official actions — that is "pay to play."  To execute his "pay to play" scheme, Blagojevich conspired with others, including his campaign fund, Friends of Blagojevich, and those interested in "paying-to-play," like horse track owner John Johnston.

2.      In this lawsuit, Plaintiff Casinos seek to right one facet of the rampant corruption uncovered as a result of the U.S. Attorney's criminal investigation of Blagojevich: Blagojevich's deal with John Johnston to secure enactment and to sign two bills that forced four Illinois casinos to pay a percentage of their profits to five horse tracks in Illinois, including

Balmoral Park and Maywood Park, each owned or controlled by John Johnston. For enacting this extraordinary legislation, Johnston, Balmoral Park and Maywood Park agreed to pay Blagojevich or his campaign hundreds of thousands of dollars. Blagojevich, Johnston, and their co-conspirators executed their scheme through multiple acts of mail and wire fraud and an ongoing pattern of illegal payments to Blagojevich and his campaign, in violation of federal and Illinois criminal law.

3.      Plaintiff Casinos were directly victimized by this criminal conduct. As a direct and proximate result of the pay-to-play scheme described in this complaint, Plaintiff Casinos have had to pay approximately $89.2 million into Funds that, absent this suit, would be paid over to horse racing concerns and their owners. Balmoral Park and Maywood Park, together with other Illinois horse tracks, stand to receive tens of millions of dollars from these Funds — an unconscionably tainted return from the "investment" Johnston and his horse tracks paid to Blagojevich. To prevent this result, Plaintiff Casinos have brought this suit, seeking: (a) to recover damages inflicted on Plaintiff Casinos by the pattern of racketeering activities that resulted in Blagojevich's signing into law the 2006 Racing Act and then effectively extending that law in 2008; (b) to impose a constructive trust over any proceeds paid, or any claims to proceeds to be paid, to horse racing tracks from the Funds into which those proceeds have been paid; and (c) to recover punitive damages, attorney fees, and costs as permitted by law.

## PARTIES

4.      Plaintiff Empress Casino Joliet Corp. is an Illinois corporation with its principal place of business the Empress Casino in Joliet, Illinois. It is the owner-licensee of a riverboat gambling casino known as the Empress Casino.

5.      Plaintiff Des Plaines Development Limited Partnership is an Illinois limited partnership doing business as Harrah's Casino Cruises Joliet.  Its principal place of business is in Joliet, Illinois and it is the owner-licensee of a riverboat gambling casino known as Harrah's Casino-Joliet.

6.      Plaintiff Hollywood Casino-Aurora is an Illinois corporation with its principal place of business the Hollywood Casino in Aurora, Illinois.  It is the owner-licensee of a riverboat gambling casino known as the Hollywood Casino Aurora.

7.      Plaintiff Elgin Riverboat Resort-Riverboat Casino is an Illinois general partnership doing business as the Grand Victoria Casino.  Its principal place of business is in Elgin, Illinois and it is the owner-licensee of a riverboat gambling casino known as the Grand Victoria.

8.      Defendant Blagojevich is a citizen of Illinois and was during times relevant to this complaint the Governor of the State of Illinois.  On January 8, 2009, the Illinois House of Representatives voted to impeach Blagojevich by a 114-1 vote.  Subsequently, the Illinois State Senate unanimously convicted Blagojevich and removed him from office because of, among other things, his misuse of the Office of the Governor in the manner described in this complaint.

9.      Defendant Friends of Blagojevich is a private entity existing under the laws of Illinois as a campaign committee for the purpose of supporting the election of Blagojevich as Governor of Illinois.  Formed in or about June 2000, Friends of Blagojevich was the principal campaign fundraising vehicle for Blagojevich.  Friends of Blagojevich maintained office at 4147 North Ravenswood, Chicago, Illinois.  Although various individuals held the office of chairman of Friends of Blagojevich, at all times Blagojevich controlled and directed the activities and financial affairs of Friends of Blagojevich for his own benefit.

10.     Defendant John Johnston is a citizen of Illinois.  Johnston is an owner of, and controls, horse racing tracks in Illinois, including Balmoral Park in Crete, Illinois and Maywood Park in Melrose Park, Illinois.

11.     Defendant Balmoral Park is incorporated in the state of Ohio, and maintains its principal place of business in Crete, Illinois.  Johnston is the President of Balmoral Park.

12.     Defendant Maywood Park is incorporated in the state of Illinois, and maintains its principal place of business in Melrose Park, Illinois.

13.     Defendant Arlington Park is an Illinois LLC, and maintains its principal place of business in Arlington Heights, Illinois.

14.     Defendant Fairmount Park is Delaware corporation, and maintains its principal place of business in Collinsville, Illinois.

15.     Defendant Hawthorne is an Illinois corporation, and maintains its principal place of business in Cicero, Illinois.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 15(a) in that the Plaintiff Casinos are asserting claims arising under the Racketeer Influenced and Corrupt Organizations Act 18, U.S.C. § 1962.  This Court has supplemental jurisdiction over the Plaintiff Casinos' state law claims, pursuant to 28 U.S. § 1367.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## BACKGROUND

### I.     The Duties and Powers of the Office of the Governor.

18.     The Office of the Governor of the State of Illinois was entrusted with extensive duties including, among other things, supporting, approving and vetoing legislation and otherwise setting priorities and direction for the State of Illinois.  As chief executive of the State of Illinois, Blagojevich was responsible for administration of all areas of the executive branch of state government not under the authority of the other constitutionally-elected officials.   The Office of the Governor employed staff members to assist the Governor in performing his duties.

19.     While serving as Governor and as an employee of the State of Illinois, Blagojevich was bound by the following laws, duties, policies and procedures:

(a)     As Governor, Blagojevich was a constitutional officer and as such, at the outset of each term, was required to and did take an oath of office to support the Constitution of the United States and the Constitution of the State of Illinois, and to faithfully discharge the duties of the office of Governor to the best of his ability.

(b)     Pursuant to Article VIII, Section 1(a) of the Constitution of the State of Illinois, public funds, property and credit shall be used only for public purposes.

(c)     In the performance of his public duties as Governor, Blagojevich owed a duty of honest service to the people of the State of Illinois.

(d)     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-3(c) and (d)),  Blagojevich was prohibited from committing the following acts in his official capacity: (1) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; and (2) soliciting or knowingly accepting, for the performance of any act, a fee or reward which he knows is not authorized by law.

(e)      Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-1(d)), Blagojevich was prohibited from receiving, retaining, or agreeing to accept any property or personal advantage which he was not authorized by law to accept, knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of his public office.

(f)      Pursuant to the criminal laws of the State of Illinois (50 ILCS 105/3), Blagojevich was prohibited from being, in any manner, financially interested, either directly or indirectly, in any contract or the performance of any work in regard to which he may have been called upon to act.

**II.      The Horse Racing Track Legislation**

**A.      Blagojevich Intervenes to Enact the 2006 Racing Bill.**

20.      In 2006, the Illinois State Legislature considered a bill — House Bill 1917 — that proposed to require casinos in Illinois to pay a certain percentage of their revenues into a fund (the "2006 Act Fund") for redistribution to horse racing tracks in Illinois.

21.      Balmoral Park and Maywood Park together with their owner, Johnston, stood to reap a windfall of tens of millions of dollars if such legislation was enacted.

22.      On March 3, 2006, the Illinois House of Representatives first considered House Bill 1917.  The bill faced significant opposition.  During the debate on it, opponents of House Bill 1917 protested that taxing one industry simply to subsidize another industry was  "poor public policy," especially where the proceeds from the tax would effectively go to race track owners while social service programs went unfunded.  Failing to receive sufficient votes to pass, House Bill 1917 was placed for deferred consideration at the request of the sponsor of the bill.

23.      On March 29, 2006, though House Bill 1917 remained unchanged, the Illinois House of Representatives again considered it and once again rejected it.

24.     Despite having been twice rejected, on April 26, 2006, the Illinois House of Representatives took up the bill again – this time renamed House Bill 1918.  By this point, some members of the Illinois State Legislature questioned the circumstances that brought the bill before the Illinois House of Representatives for a third time in less than two months.

25.     Representative William Black expressed his concern during the debate on the Bill:  "I've been here a long time and I know when something doesn't smell right."  He observed that "you don't get 12 or 14 people to change their vote on an issue like this, after two bites of the apple, unless something's going on. . . ."

26.     Indeed, something was going on.  Then-Governor Blagojevich had begun holding closed door meetings with representatives who had previously voted against the Bill.  During the debate in the Illinois House of Representatives, Rep. Black described the effect of Blagojevich's backroom efforts:

> [W]hen one of your staffers comes up in an excited voice and says, 'Representative, the Governor and the Speaker want you to come down to the Governor's Office right now.'  Well, I'm sure she didn't go down there to be told what a wonderful job the House of Representatives is doing.  You know the love that the Governor has for all of us.  I know why she went down there, ya get the Roll Call and ya look at 14, 15, 16 people that changed from 'no' to 'yes' on the Amendment.  It might be interesting in the unlimited debate if somebody will tell us, what's the deal.  What's the deal?

27.     Presaging the Federal Grand Jury's indictment of Blagojevich, Rep. Black further observed:

> Don't we ever learn anything around here?  Haven't ya heard the U.S. Attorney saying there should be no quid pro quo in Illinois politics?  Then what's going on?  Why are some of you called down to the Governor's Office, then you come back up and you change your vote?  You voted 'no' twice on this Bill.  You're gonna tell me this has changed so dramatically that all of a sudden you're gonna vote 'yes'?  Well, Mr. U.S. Attorney in Chicago, get your subpoenas out because I guess we're never gonna learn

anything in the State of Illinois. You wanna change your vote
because you've suddenly grown fond of horses, that's fine, but I
don't think that's the reason some of you changed your vote.

28. On May 26, 2006, Blagojevich signed the bill into law (the "2006 Racing Act").
The 2006 Racing Act applied only to the four Plaintiff Casinos and required them to pay 3% of
their adjusted gross receipts for two years into the 2006 Act Fund. The 2006 Act Fund was to
then be paid over to the horse racing tracks who would use the collected casino revenues to
increase purses and pay the expenses of the track owners and operators. By these means, the
2006 Racing Act directly increased the profitability of the horse tracks for track owners and
investors, like Johnston, at the expense of the Plaintiff Casinos here. Balmoral Park and
Maywood Park, owned and controlled by Johnston, would potentially receive tens of millions of
dollars from the 2006 Act Fund.

### B. Blagojevich Sold, and Johnston Bought, Enactment of the 2006 Racing Act.

29. Blagojevich's actions facilitating the passage of the 2006 Racing Act and his
signing that Act into law were part of a broader scheme whereby Blagojevich conspired with
Johnston and others to use his power and the Office of the Governor to enrich himself and
Friends of Blagojevich, and to enrich his co-conspirators, without regard to the honest and
faithful services he owed the people of Illinois and without regard to the law. Blagojevich had
sold, and Johnston had purchased, enactment of this law.

30. Specifically, on information and belief, between April and June of 2006,
Blagojevich and Johnston, and possibly others in the horse racing industry, agreed that Johnston
or his affiliates would pay Blagojevich or Friends of Blagojevich money in exchange for
Blagojevich ensuring the enactment of the 2006 Racing Act, including by signing it into law.

31.     To hide the true size of Johnston's, Balmoral Park's and Maywood Park's payment to Blagojevich pursuant to their conspiratorial agreement, and thereby to conceal their unlawful scheme, Johnston arranged for this money to be paid through several entities under his control.

32.     More particularly, on or about June 27, 2006, just a month after Blagojevich signed the 2006 Racing Act into law, Johnston fulfilled his end of his agreement with Blagojevich by causing several entities under his control (the "Johnston Affiliates") to contribute a total of $125,000 to Friends for Blagojevich.   Specifically, Balmoral Racing Club, Inc. contributed $10,000;   Maywood Park Trotting Association contributed $10,000; Racing Association of Illinois contributed $20,000;   Coast to Coast Food Services, Ltd. contributed $25,000; Egyptian Trotting Association contributed $20,000; and Associates Racing Association Inc. contributed $40,000.

33.     Both directly and indirectly, Johnston controlled each of the Johnston Affiliates:

(a)     Johnston was an owner and President of Balmoral Racing Club.

(b)     Johnston was an owner of Maywood Park Trotting Association.

(c)     Johnston was an owner of the Racing Association of Illinois.

(d)     Coast to Coast Food Services Ltd. is registered to Johnston's brother, William H. Johnston III, and is located at the same address as Maywood Park.  Moreover, Jennifer S. Swindal is the corporate secretary of Coast to Coast Food Services, Ltd. and the ex-wife of Stephen Swindal, the chairman of Maywood Park and a registered lobbyist for the Johnston-owned Racing Associations of Illinois.

(e)     Egyptian Trotting Association is also registered to William H. Johnston III at the Maywood Park address.  Lester McKeever is the corporate secretary of the company.

McKeever also serves as the corporate secretary of the Johnston-owned Maywood Park, and is a board member of Balmoral Park.

(f) Associates Racing Association Inc. is also registered to Lester McKeever.

34. Thus, Johnston had ready a web of inter-related entities through which he could divide, and thereby attempt to conceal, his unlawful payments to Blagojevich through Friends of Blagojevich. Johnston utilized this web of inter-related entities to effect his payment to Blagojevich in exchange for which Blagojevich secured enactment of the 2006 Racing Act.

**C. Blagojevich Sold, and Johnston Purchased, Enactment of the 2008, Racing Act**

35. Although the 2006 Racing Act was set to expire after two years, in 2008, a bill was introduced in the Illinois State Legislature to effectively extend the 2006 Racing Act by requiring the Plaintiff Casinos to continue to pay 3% of their adjusted gross receipts into a Fund (the "2008 Act Fund") for an additional three years. Again, Johnston, by and through Balmoral Park and Maywood Park, stood to receive tens of millions of dollars from enactment of this bill.

36. In or about October through December 2008, Blagojevich and Johnston, just as they had done in 2006, directly or indirectly, engaged in discussions that resulted in an agreement that Johnston would pay Blagojevich or Friends of Blagojevich $100,000 for the enactment of the new bill into the law that would effectively extend the 2006 Racing Act (referred to here as the "2008 Racing Act"). Some of the negotiations that led to and that reflect this agreement were captured on court-authorized Title III wiretaps as part of the five-year continuing public corruption investigation of Blagojevich conducted by the United States Attorney's Office for this District in cooperation with other federal agencies.

37. In particular, on or about November 13, 2008, Blagojevich told his brother, Robert Blagojevich, who was at that time chairman of Friends for Blagojevich, that Blagojevich

wanted Johnston to make a payment, in the form of a campaign contribution related to the enactment of the 2008 Racing Act before the end of the 2008.

38.　　Alonzo Monk, a long-time associate of Blagojevich, conducted some of the 2008 negotiations that resulted in Johnston agreeing to pay money to Blagojevich or Friends of Blagojevich to secure enactment of the 2008 Racing Act.　Monk had served as Blagojevich's general counsel while Blagojevich was a Member of Congress, as campaign manager for Blagojevich's 2002 and 2006 gubernatorial campaigns, on his transition team following Blagojevich's election in November 2002, and as Blagojevich's Chief of Staff from in or about January 2003 until in or about December 2005.　Monk had also served as chairman of Friends of Blagojevich from approximately December 2006 to July 2007.　In the fall of 2008, Monk worked as a lobbyist representing businesses with interests involving Illinois state government, including businesses in the horse racing industry.　Monk is now a co-defendant in the Superseding Indictment against Blagojevich.

39.　　On November 13, 2008, Blagojevich and his brother Robert Blagojevich discussed the $100,000 payment from Johnston.　Robert Blagojevich told Blagojevich that Monk "says Johnny Johnston is good for it."　Robert Blagojevich explained that Johnston was deciding from which accounts to make the contribution.　Robert Blagojevich said, "He's gonna give you … ya know, he didn't get it.　But he said, ya know, I'm good for it.　I gotta just decide what, what uh, accounts to get it out of."　Robert Blagojevich is also a co-defendant in the superseding criminal indictment against Blagojevich.

40.　　On November 20, 2008, the bill that became the 2008 Racing Act was sent to Blagojevich to either sign or veto.

41.     Before he would sign it, however, Blagojevich had additional conversations with Monk regarding whether Johnston would live up to his agreement to make payment to Blagojevich or Friends of Blagojevich once the bill was signed, as he had in 2006.

42.     Specifically, on or about December 3, 2008, Blagojevich told Monk that he was concerned that Johnston would not make payment to Blagojevich or Friends of Blagojevich by the end of the year if Blagojevich signed the bill before receiving payment.   In light of Blagojevich's concerns, Monk agreed to talk with Johnston to ensure that Johnston would pay Blagojevich the promised money by the end of 2008, thereby living up to their conspiratorial agreement.

43.     After talking with Blagojevich on December 3, 2008, Monk visited Johnston. During that visit, Monk communicated Blagojevich's anxiety that Johnston would not make the promised payment to Blagojevich before the end of the year if Blagojevich signed the bill first.

44.     Following his meeting with Johnston, Monk told Blagojevich that he had relayed Blagojevich's concern about signing the bill without having received Johnston's money.   Monk said that he told Johnston:  "Look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment."   Monk said that he emphasized that the payment has "got to be in now."   Johnston apparently agreed to do so and Blagojevich responded, "good," and "good job."

45.     On or about December 4, 2008, Monk, who was in Miami, Florida, called Blagojevich in Chicago, Illinois.  During that call, Monk asked Blagojevich to call Johnston directly to discuss signing the bill in exchange for the payment of the $100,000 to Friends of Blagojevich as this would be better "from a pressure point of view."   Blagojevich agreed to call Johnston directly.

46.     On December 9, 2008, agents of the Federal Bureau of Investigation arrested Blagojevich on federal corruption charges, including RICO violations.

47.     Six days later, on December 16, 2008, Blagojevich signed the 2008 Racing Bill.

       **D.     The Plaintiff Casinos Have Paid Approximately $89.2 Million into the 2006 and 2008 Act Funds.**

48.     As a direct result of Blagojevich securing the enactment of the 2006 Racing Act and 2008 Racing Act in exchange for Johnston's payments or promises to pay, the Plaintiff Casinos have paid 3% of their adjusted gross revenues into the 2006 and 2008 Act Funds, paying approximately $89.2 million in total.

49.     Absent the relief sought in this lawsuit, including imposition of a constructive trust over the subject monies, the Plaintiff Casinos' revenues paid into the 2006 and 2008 Act Funds will be turned over to five Illinois horse racing tracks.

50.     Specifically, pursuant to 2006 and 2008 Racing Acts, if the 2006 and 2008 Act Funds are distributed, the horse racing tracks may use those casino revenues to increase the size of their purses in order to make gambling at the horse tracks more attractive.  The tracks may also use these monies to "improve, maintain, market, and otherwise operate its racing facilities to conduct live racing."  This puts the entire approximately $89.2 of Plaintiff Casinos' revenues into the pockets of the owners and operators of the horse racing tracks, improving the profitability of the racing tracks and otherwise enriching the owners and operators of those tracks, such as Johnston, at the direct expense of the Plaintiff Casinos.

**COUNT I**
**VIOLATION OF THE RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c), (d)**
(Against Blagojevich, Friends of Blagojevich, Johnston,
Balmoral Park and Maywood Park)

**RICO Persons**

51.     Defendants Blagojevich, Friends of Blagojevich, Johnston, Balmoral Park, and Maywood Park (the "RICO Defendants") are each capable of holding a legal or beneficial interest in property, and therefore each is a "person" within the meaning of 18 U.S.C. § 1961(3).

**The RICO Enterprise**

52.     At all relevant times, Blagojevich, the Office of the Governor of Illinois, and Friends of Blagojevich were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce.  This enterprise shall be referred to here as the "Blagojevich Enterprise."  The Blagojevich Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

53.     The primary purpose of the Blagojevich Enterprise was to exercise and preserve power over the government of the State of Illinois for the financial and political benefit of Blagojevich, both directly and indirectly through Friends of Blagojevich.

54.     For the purpose of 18 U.S.C. § 1962(c), and during the periods most relevant to this complaint, Blagojevich, Friends of Blagojevich, and the Office of the Governor each had authority within the Blagojevich Enterprise, and/or conducted or participated, directly or indirectly, in the conduct of the Blagojevich Enterprise's affairs through the pattern of racketeering activity described below.

55.     In addition to Blagojevich, Friends of Blagojevich and the Office of the Governor, numerous other individuals also conducted or participated directly or indirectly, or conspired, in the conduct of the Blagojevich Enterprise's affairs, as identified in the Superseding Indictment of Blagojevich and others, a copy of which is attached here as Exhibit 1.

56.     In addition, and as described further herein, Johnston, Balmoral Park and Maywood Park did conspire with the Blagojevich Enterprise and its participants.

### Effect on Interstate Commerce

57.     The Blagojevich Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of the telephones, by electronic transfers of funds, and through the mailing of checks.  Moreover, the Blagojevich Enterprise directly impacted the casino and horse racing industries, which are conducted through interstate commerce.

### Predicate Acts of Racketeering Activity

58.     Through the Blagojevich Enterprise, or in conspiracy with it in the case of Johnston, Balmoral Park and Maywood Park, the RICO Defendants conducted, engaged in, and participated in a pattern of racketeering activity, consisting, at a minimum, of the following predicate acts:  (a) multiple violations of Title 18, United State Code, Sections §  1341, 1343, and 1346 (mail fraud and wire fraud); and (b) numerous acts of making and/or receiving illegal payments, or conspiring to do so, in violation of Illinois criminal statute 720 ILCS 5/33-1, 5/33-3, and 230 ILCS 5/24(f).

59.     Specifically, the RICO Defendants' predicate acts include, but are not limited to, the following:

(a)     In furtherance of a scheme or artifice to defraud as defined in 18 U.S.C. §§ 1341 & 1346, and with specific intent to defraud, Defendant Blagojevich knowingly used or

caused to be used the mails and wire communications to deprive the people of Illinois of their right to the honest service of their public officials. Defendants' specific acts of mail and/or wire fraud include at least the following:

(i)    On or about November 13, 2008, for the purpose of executing the scheme to obtain illegal payments from Johnston, Balmoral Park and Maywood Park, Blagojevich, in Chicago, Illinois, and Robert Blagojevich in Nashville, Tennessee talked by telephone regarding payment of money from Johnston and/or Johnston-affiliated entities, such as Balmoral Park and Maywood Park, in exchange for Blagojevich securing enactment of the 2008 Racing Act.

(ii)    On or about December 4, 2008, for the purpose of executing the scheme to obtain illegal payments from Johnston, Balmoral Park, and Maywood Park, Blagojevich in Chicago, Illinois, and Alonzo Monk in Miami, Florida, talked by telephone regarding the payment of money from Johnston and Johnston-affiliated entities, such as Balmoral Park and Maywood Park, in exchange for Blagojevich securing enactment of the 2008 Racing Act. During this telephone call, Blagojevich agreed with Monk that, in order to obtain the money sought from Johnston in exchange for his signing the 2008 Racing Act into law, it would be better "from a pressure point of view" for Blagojevich to call Johnston directly to discuss the unlawful scheme.

(iii)    Upon information and belief, on or after December 4, 2008, for the purpose of executing the scheme to obtain illegal payments from Johnston and Johnston-affiliated entities, such as Balmoral Park and Maywood Park, Blagojevich did communicate with Johnston by telephone regarding the payment of money to him or Friends of Blagojevich and the enactment by Blagojevich of the 2008 Racing Act.

(iv)     Upon information and belief, in April or May 2006, Blagojevich and Johnston, directly or indirectly, had a series of telephone communications similar to those that took place in November and December of 2008, all with the purpose of executing the scheme for Blagojevich to obtain illegal payments from Johnston and Johnston-affiliated entities, such as Balmoral Park and Maywood Park, in exchange for Blagojevich securing the enactment of the 2006 Racing Act.

(b)     Blagojevich, Friends of Blagojevich, Johnston, Balmoral Park and Maywood Park conspired to violate 18 U.S.C. §§ 1341 & 1346 by reaching agreement that they would deprive the people of Illinois of their right to the honest service of their public officials in the manners described above.   Each of these Defendants performed numerous actions in furtherance of such agreement including the use of wire communications to coordinate their agreement that Johnston, Balmoral Park, and Maywood Park would pay at least $100,000 to Friends of Blagojevich in return for Blagojevich's agreement to enact the 2008 Racing Bill, all in violation of 18 U.S.C. § 371.

(c)     With the intent to influence, or cause a person to influence, the performance of an act related to the employment or function of a public officer and public employee, in violation of Illinois criminal law 720 ILCS 5/33-1(a) & (c), Johnston, Balmoral Park, and Maywood Park agreed to or in fact tendered to Blagojevich or Friends of Blagojevich:

(i)     Money in the amount of $100,000 in order to secure enactment of the 2008 Racing Act; and

(ii)     Money in the amount of $125,000 in order to secure enactment of the 2006 Racing Act.

(d)     In 2006, Blagojevich and Friends of Blagojevich received, retained or agreed to accept property or personal advantage which they were not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause Blagojevich or Friends of Blagojevich to influence the performance of Blagojevich's employment or function as a public officer, namely to secure enactment of the 2006 Racing Act. In so doing, these Defendants violated, and conspired to violate, Illinois criminal law 720 ILCS 5/33-1(d).  Specific acts in this regard included the following payments, which were made by either check, on information and belief sent by U.S. mail, or else by electronic wire transfer and which were paid and received with the intent to pay Blagojevich to secure enactment of the 2006 Racing Act:

(i)     on or about June 27, 2006, $10,000 from Balmoral Racing Club, Inc.;

(ii)    on or about June 27, 2006, $10,000 from Maywood Park Trotting Association;

(iii)    on or about June 27, 2006, $20,000 from Racing Association of Illinois;

(iv)    on or about June 27, 2006, $25,000 from Coast to Coast Food Services, Ltd.;

(v)     on or about June 27, 2006, $20,000 from Egyptian Trotting Association; and

(vi)    On or about June 27, 2006, $40,000 from Associates Racing Association Inc.

(e)     In or about November or December 2008, Defendants Blagojevich and Friends of Blagojevich agreed to accept property or personal advantage pursuant to an understanding that Blagojevich would improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer or public employee.   In so doing, Blagojevich and Friends of Blagojevich violated 720 ILCS 5/33-1(d) and (e).  Defendants' specific acts in violation of this criminal law include at least the following:

(i)     On or about December 3, 2008, on behalf of Blagojevich and Friends of Blagojevich, Alonzo Monk spoke with Johnston, Balmoral Park, and Maywood Park for the purpose of agreeing that Johnston would pay Blagojevich or Friends of Blagojevich at least $100,000 before the end of the year pursuant to an understanding that in return, Blagojevich and Friends of Blagojevich would use Blagojevich's influence to enact the 2008 Racing Bill.

(ii)     Upon information and belief, sometime between December 4, 2008 and December 16, 2008, Blagojevich did agree with Johnston, Balmoral Park, and Maywood Park that they would pay Blagojevich or Friends of Blagojevich at least $100,000 before the end of the year pursuant to an understanding that in return Blagojevich and Friends of Blagojevich would use Blagojevich's influence to enact the 2008 Racing Bill.

(f)     Defendants Blagojevich, Friends of Blagojevich, Johnston, Balmoral Park, and Maywood Park conspired and intended to violate 720 ILCS 5/33-1 by agreeing that Johnston, Balmoral Park, and Maywood Park would pay some amount to Blagojevich or Friends of Blagojevich in exchange for Blagojevich's agreement to secure the enactment of the 2006 and 2008 Racing Acts, and as described above, each Defendant performed numerous actions in furtherance of such agreement, all in violation of 720 ILCS 5/8-2.

(g)     Defendants Balmoral Park and Maywood Park are organization licensees as defined in the Illinois Horse Racing Act of 1975 (230 ILS 5/1 *et seq.*).  Defendant Johnston is an officer, director, and holder or controller of 5% or more legal or beneficial interest in Balmoral Park and Maywood Park.  Accordingly, Johnston, Balmoral Park, and Maywood Park were prohibited by Illinois law from making any sort of gift or contribution of any kind or paying or giving any money or other thing of value to any person who is a public official or a candidate or nominee for public office.  In violation of 720 ILCS 5/33-3, on June 27, 2006, Blagojevich accepted money payments totaling $125,000 from Johnston, Balmoral Park, and Maywood Park in exchange for enacting the 2006 Racing Act.

(h)     Although the above predicate acts forming a pattern of racketeering are the most germane to the claims raised in this Complaint, the Blagojevich Enterprise extended far beyond those schemes.  As detailed in the Superseding Indictment of Blagojevich, a copy of which is attached as Exhibit 1, the Blagojevich Enterprise encompassed a wider pattern of racketeering activity consisting of further acts of mail fraud and wire fraud (in violation of 18 U.S.C. §§ 1341, 1343, and 1343), extortion, attempted extortion, and conspiracy to commit extortion (in violation of 18 U.S.C. §§ 1951(a)) and multiple acts involving bribery (in violation of 720 ILCS 5/33-1(c) and (d)).

### Pattern of Racketeering Activity

60.     The RICO Defendants acted, and conspired to act together, and in association with others knowingly and repeatedly committed the above criminal acts in furtherance of and for the purpose of enriching Blagojevich both financially and politically and to otherwise further the ends of the Blagojevich Enterprise.

61.     The predicate acts described above were related to one another as part of a common scheme or plan.

62.     Such unlawful conduct constituted a continuous pattern of racketeering activity beginning in or around 1998 through sometime in or around December 2008.

**Conspiracy**

63.     As described above, Johnston, Balmoral Park and Maywood Park, in violation of 18 U.S.C. § 1962(d), did agree and conspire with Blagojevich and Friends of Blagojevich, and those acting in concert with Blagojevich and Friends of Blagojevich, to violate 18 U.S.C. § 1962(c) for the purpose of achieving and profiting from the racketeering activities described above related to the 2006 and 2008 Racing Acts.  In furtherance of that agreement, each of the RICO Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

**Injuries to the Plaintiff Casinos' Business and Property**

64.     As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), and the described conspiracy in violation of 18 U.S.C. § 1962(d), the Plaintiff Casinos have been injured in their business and property.  The RICO Defendants' racketeering activities secured the enactment of the 2006 and 2008 Racing Acts and thereby directly resulted and were the proximate cause of the Plaintiff Casinos being compelled to deposit approximately $89.2 million into the 2006 and 2008 Act Funds for redistribution to horse racing tracks, including tens of millions of dollars to Balmoral Park and Maywood Park, for the benefit of the owners and operators of those tracks, including Johnston.  These injuries were a foreseeable consequence of the RICO Defendants' racketeering activities and violations

of 18 U.S.C. § 1962(c), and their conspiracy in furtherance of those racketeering violations, in violation of 18 U.S.C. § 1962(d).

**WHEREFORE**, Plaintiff Casinos respectfully request the Court to enter judgment in their favor and against each of the RICO Defendants, and order the following relief:

(a)     All damages proven pursuant to RICO, trebled as permitted by law, in an amount not less than $267.6 million;

(b)     Punitive damages, attorney fees, and costs as permitted by law; and

(c)     Such other and further relief as the Court may deem just and appropriate.

**COUNT II**
**CONSTRUCTIVE TRUST**
**(Against Balmoral Park, Maywood Park,**
**Arlington Park, Fairmount Park and Hawthorne)**

65.     The Plaintiff Casinos reallege and incorporate by reference herein the allegations of paragraphs 1-64 of this Complaint as if fully set forth herein.

66.     The RICO Defendants' racketeering activities secured the enactment of the 2006 and 2008 Racing Acts and thereby directly resulted and were the proximate cause of the Plaintiff Casinos being compelled to deposit approximately $89.2 million into the 2006 and 2008 Act Funds for redistribution to horse racing tracks, including Balmoral Park and Maywood Park, as well as Arlington Park, Fairmount Park and Hawthorne, and or their owner/operators, including Johnston. Such revenues would have otherwise accrued to the Plaintiff Casinos' benefit and to the benefit of the owners and operators of the Plaintiff Casinos.

67.     Pursuant to the 2006 and 2008 Racing Act, Defendants Balmoral Park, Maywood Park, Arlington Park, Fairmount Park, and Hawthorne have been paid, or have claims to payment, of revenues that the Plaintiff Casinos were forced to pay into the 2006 and 2008 Act Funds as a direct result of the racketeering activities described above.

68.     Because the money in the 2006 and 2008 Act Funds, or claims to the money in those Funds, that they possess exist as a direct result of illegal and/or fraudulent activity, Balmoral Park, Maywood Park, Arlington Park, Fairmount Park, and Hawthorne have been substantially and unjustly enriched such that it would be inequitable and contrary to law to allow them each to keep any of this money or any claim to it.

69.     Therefore, a constructive hold is properly imposed for the benefit of the Plaintiff Casinos over the subject funds, or claims to those funds, owned by Balmoral Park, Maywood Park, Arlington Park, Fairmount Park, and Hawthorn.

**WHEREFORE**, the Plaintiff Casinos respectfully request this Court enter judgment in its favor and against each of the Defendants, and order the following relief:

(a)     A constructive trust shall be imposed for the benefit of the Plaintiff Casinos over all proceeds of the Fund paid to any of the Defendants and any claim by any Defendant to such proceeds ; and

(b)     Such other and further relief as the Court may deem just and appropriate.

Dated: June 12, 2009

Respectfully submitted,

EMPRESS CASINO JOLIET
CORPORATION, DES PLAINES
DEVELOPMENT LIMITED PARTNERSHIP,
HOLLYWOOD CASINO-AURORA, INC.
and ELGIN RIVERBOAT RESORT-
RIVERBOAT CASINO

By: /s/ Robert M. Andalman
         One of Their Attorneys

Jeremy D. Margolis (ARDC No.: 1763865)
Robert M. Andalman (ARDC No.: 6209454)
Blair R. Zanzig (ARDC No.: 6273293)
Stacy A. Manning (ARDC No.: 6290127)
LOEB & LOEB LLP
321 North Clark Street, Suite 2300
Chicago, Illinois 60610
Telephone: (312) 464-3100
Facsimile: (312) 464-3111

*Counsel for Plaintiffs Empress Casino-Joliet
Corp., Des Plaines Development Limited
Partnership, Hollywood Casino-Aurora, Inc.
and Elgin Riverboat Resort-Riverboat Casino*