**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EMPRESS CASINO JOLIET CORP.,** | ) | |
| **DES PLAINES DEVELOPMENT LTD.** | ) | |
| **P'SHIP, HOLLYWOOD CASINO-** | ) | |
| **AURORA, INC., and ELGIN RIVERBOAT** | ) | |
| **RESORT - RIVERBOAT CASINO,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09 C 3585** |
| | ) | |
| **ROD BLAGOJEVICH, FRIENDS OF** | ) | |
| **BLAGOJEVICH, JOHN JOHNSTON,** | ) | |
| **BALMORAL RACING CLUB, INC.,** | ) | |
| **MAYWOOD PARK TROTTING ASS'N,** | ) | |
| **INC., ARLINGTON PARK RACECOURSE,** | ) | |
| **LLC, FAIRMOUNT PARK, INC., and** | ) | |
| **HAWTHORNE RACE COURSE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY,  District Judge:

The plaintiffs in this case own and operate riverboat gambling casinos in Elgin,

Joliet, and Aurora, Illinois.  They have sued former Illinois governor Rod Blagojevich,

his campaign committee Friends of Blagojevich ("FOB"), five entities that operate horse

racing tracks in Illinois (Balmoral Park, Maywood Park, Arlington Park, Fairmount Park,

and Hawthorne, collectively, "the racetracks"), and John Johnston, the owner of

Balmoral Park and Maywood Park.   The casinos' complaint includes two claims:  a

claim against Blagojevich, FOB, Johnston, Balmoral Park, and Maywood Park under

the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c), and a

state law constructive trust claim against the five horse racing tracks.

The defendants have moved to dismiss the complaint. Plaintiffs have moved for a preliminary injunction preventing the distribution of disputed funds to the defendant racetracks. The preliminary injunction motion is premised exclusively on the state law constructive trust claim. The Court previously entered a temporary restraining order to preserve the status quo pending determination of the motion for preliminary injunction. For the reasons stated below, the Court declines to dismiss the RICO claim (Count 1), dismisses the constructive trust claim (Count 2) for lack of subject matter jurisdiction, and denies the motion for preliminary injunction because it is premised on a claim over which the Court lacks jurisdiction.

## Facts

The casinos allege that while Blagojevich was governor, he systematically exchanged and attempted to exchange his official actions as governor for benefits to himself and his family and contributions to FOB. *See* Compl. ¶¶ 29 & 59(h) (alleging "broad[ ] scheme" and incorporating indictment in *United States v. Blagojevich*, No. 08 CR 888); Compl., Ex. 1 (indictment) ¶¶ 9-11. That course of conduct, the casinos allege, included a scheme that they say affected them directly. This alleged scheme concerned two legislative enactments, one in 2006 and one in 2008, that required Illinois casinos to pay a percentage of their revenues into a fund for distribution to Illinois horse racing tracks.[1] The rationale for the legislation was that riverboat gambling had cut into the business of the Illinois horse racing and breeding industry, which the

---

[1]Casinos that had less than $200,000,000 in gross receipts in 2004 were exempt from the Act. 230 ILCS 10/7.

legislature estimated provides 37,000 jobs to Illinois residents.

The casinos allege that Blagojevich directly importuned a number of Illinois legislators to vote in favor of the 2006 legislation (the "2006 Racing Act"), which the legislature passed as a result and Blagojevich then signed into law. Compl. ¶¶ 22-28. Blagojevich did this, they allege, because Johnston had agreed on behalf of the racetracks that they would contribute a total of $125,000 to FOB in exchange for Blagojevich ensuring the adoption of the 2006 Racing Act and signing it into law. *Id.* ¶¶ 29-30. Johnston fulfilled his end of the deal, plaintiffs allege, about a month after Blagojevich signed the legislation. *Id.* ¶¶ 31-34.

Under the 2006 Racing Act, the casinos were required to pay three percent of their adjusted gross receipts to the state of Illinois. The Act provided that the state would deposit those funds into the newly-created Horse Racing Equity Trust Fund and that the Illinois Racing Board, as administrator of the Fund, would disburse the proceeds to the racetracks. The racetracks were required to spend sixty percent of the money to increase purses for horse races and the rest on improving and operating their facilities.

In May 2006, the casinos sued Illinois' Treasurer and the Illinois Racing Board in state court in Will County. They alleged that the 2006 Racing Act violated the Takings and Due Process Clauses of the federal constitution and the public purpose, uniformity, equal protection, and special legislation provisions of the Illinois Constitution. The casinos invoked the State Officers and Employees Money Disposition Act (the Protest Monies Act), 30 ILCS 230/2a, which allows a taxpayer that challenges the legality of a state tax to pay the disputed sums into a protest fund, with the money eventually

returned to the taxpayer with interest if the challenge succeeds.  In June 2006, the Will County court issued a preliminary injunction requiring the Treasurer to deposit the payments from the casinos into a protest fund and prohibiting the Treasurer from transferring those sums to the Horse Racing Equity Trust Fund while the case was pending.  Several racetracks intervened in the case on behalf of the defendants to protect their interest in the funds.  They did not, however, assert any claims of their own, nor did the casinos assert any claims against them.

The state trial court found that the 2006 Racing Act violated the Illinois Constitution's uniformity clause.  In June 2008, the Illinois Supreme Court overturned the trial court's decision and found the 2006 Act constitutional under each of the state and federal constitutional provisions the casinos had cited.  *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 896 N.E.2d 277 (2008).

The 2006 Racing Act, by its terms, was to expire after two years.  In 2008, a bill was introduced in the Illinois legislature to extend the Act for three years (the "2008 Racing Act").  In the latter part of 2008, the casinos allege, Blagojevich and Johnston agreed that Johnston would pay Blagojevich or FOB $100,000 in return for the adoption of the legislation.  Compl. ¶¶ 35-36.  A number of conversations concerning the agreement, plaintiffs say, were captured on a court-ordered wiretap that provided part of the evidence that led to the filing of a federal criminal complaint against Blagojevich in December 2008.  *Id.* ¶¶ 37-39, 41-45.  The legislature passed the 2008 Racing Act in or about November 2008 and sent it to Blagojevich for signature.  Blagojevich then took steps to make sure that Johnston would live up to his end of the deal.  *Id.* ¶¶ 44-45. Blagojevich was arrested on December 9, 2008 after federal prosecutors filed a criminal

4

complaint against him.  He signed the 2008 Racing Act on December 16, 2008.  *Id.* ¶¶
46-47.

On January 8, 2009, the casinos filed suit in Will County state court to challenge
the constitutionality of the 2008 Racing Act.  They noted in their complaint that they
were about to file a petition for certiorari in the United States Supreme Court to
challenge the Illinois Supreme Court's decision concerning the 2006 Racing Act.  In
their lawsuit concerning the 2008 Racing Act, the casinos asserted (similar to their
allegations in the first suit) that the Act violated the Takings and Due Process Clauses
of the federal constitution and the Illinois Constitution's public purpose and uniformity
requirements.  The casinos included in their complaint an allegation, based on the then-
pending criminal complaint against Blagojevich, that he had pressured an unnamed
person to contribute money to FOB in return for signing the 2008 Racing Act.  The
casinos alleged that this newly-obtained evidence supported their contentions that the
Illinois legislature's findings of a public purpose for the Act were "'evasive' and designed
to mask the fact that the primary purpose of the legislation is to benefit the racetracks'
private interests . . . ."  Arlington Park Mem. in Supp. of Mot. to Dismiss, Ex. F (state
court complaint) ¶ 7.

On June 8, 2009, the United States Supreme Court denied the casinos' petition
for certiorari in the case concerning the 2006 Racing Act.  Two days later, on June 10,
2009, the casinos returned to the Will County court and filed a petition for relief from
judgment under 735 ILCS 5/2-1401.  They contended that newly-available evidence
regarding the alleged pay-to-play scheme involving Blagojevich and Johnston showed
that the 2006 Racing Act did not satisfy the Illinois Constitution's public purpose

5

requirement, contrary to the Illinois Supreme Court's ruling.

Two days after that, on June 12, 2009, the casinos filed this suit. This was their first suit in which they asserted claims against the racetracks. As noted earlier, the casinos assert a civil RICO claim against Blagojevich, FOB, Johnston, Balmoral Park, and Maywood Park. In that claim, the casinos allege that they were the victim of a pay-to-play scheme among those defendants. The casinos also assert a state law constructive trust claim against the racetracks who are the beneficiaries of the 2006 and 2008 Racing Acts. In that claim, the casinos seek imposition of a constructive trust over the funds they were required to pay under the two Acts, alleging that "as a direct result of illegal and/or fraudulent activity, [the racetracks] have been substantially and unjustly enriched such that it would be inequitable and contrary to law to allow them each to keep any of this money or any claim to it." Compl. ¶ 68. In late August 2009, the defendants filed motions to dismiss the casinos' claims.

In late June 2009, after the present case was already pending, Arlington Park moved to intervene in both state court suits; it had not previously sought to intervene in either case. In September 2009, Balmoral and Maywood Park moved to intervene in the casinos' case challenging the 2008 Racing Act. Fairmount never moved to intervene in either case.

On August 17, 2009, the Will County court denied the casinos' section 2-1401 petition in the case concerning the 2006 Racing Act and ordered the Illinois Treasurer to transfer the disputed funds relating to that Act from the protest fund to the Horse Racing Equity Trust Fund. The casinos have sought a stay of the latter order pending appeal. In mid-November 2009, the Will County court dismissed the casinos' federal

and state constitutional challenges to the 2008 Act.

## Discussion

**1.    RICO claim**

In seeking dismissal of the RICO claim, the Blagojevich defendants argue that they are entitled to legislative immunity for his actions in connection with pending or adopted legislation.  The Court disagrees.  First, the argument that FOB, a campaign fund, is entitled to any sort of immunity from suit is frivolous; FOB cites no authority that supports the argument.  Second, the Illinois Constitution limits the protection of legislative immunity to members of the state legislature.  Ill. Const. art. IV § 2.  As the Illinois Supreme Court squarely held in 2004, in rejecting a contention by Blagojevich that he was entitled to legislative immunity from judicial scrutiny of his actions relating to legislation, the doctrine does not apply to the governor.  *Jorgensen v. Blagojevich*, 211 Ill. 2d 286, 309-10, 811 N.E.2d 652, 666 (2004).  The Seventh Circuit case on which Blagojevich relies to support his immunity claim concerned members of the state legislature – who are, in fact, entitled to legislative immunity – not the governor.   *See Thillens, Inc. v. Community Currency Exchange Ass'n of Ill., Inc.*, 729 F.2d 1128, 1129 (7th Cir. 1984).

The arguments by Johnston, Balmoral Park, and Maywood Park (the Johnston defendants) for dismissing Count 1 concern the sufficiency of the casinos' RICO allegations.  Though it appears from the complaint that the casinos have sued the Johnston defendants both for a substantive RICO violation under 18 U.S.C. § 1962(c) and for RICO conspiracy under *id.* § 1962(d), the casinos state in their response to the

motion to dismiss that they have sued the Johnston defendants only for RICO conspiracy. *See* Pls.' Mem. in Opp. to Mots. to Dismiss 12.

To state a RICO conspiracy claim, the casinos "must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). The phrase "agree[ ] . . . to participate in the affairs of an enterprise," for the purpose of a RICO conspiracy claim, means to agree

> to knowingly facilitate the activities of the operators or managers [of the RICO enterprise] . . . . One must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do.

*Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).

The parties dispute the extent to which a RICO conspiracy claim requires the actual existence of a pattern of racketeering activity as that term is defined in 18 U.S.C. §1961(5). No matter; the casinos have adequately alleged a pattern, even if the pleading requirement for a pattern on a RICO conspiracy claim under section 1962(d) is the same as for a substantive RICO claim under section 1962(c).

Proof of a pattern requires that the predicate criminal acts were related to each other and posed a threat of continuing criminal activity. *See, e.g., Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). The Johnston defendants argue that a pattern is lacking due to the fact that the alleged criminal activity "'had a built-in end point.'"

Johnston Defs.' Mem. in Support of Mot. to Dismiss 10 (quoting *Gamboa*, 457 F.3d at 708).  The 2008 Racing Act, however, had limited duration.  Given the breadth of the pay-to-play scheme that the casinos allege Blagojevich had instituted, there is a sufficient basis in the complaint for a reasonable inference that the same sort of conduct that the casinos allege took place in 2006[2] and 2008 would have repeated itself as the clock on the 2008 Racing Act began to wind down.  In short, even the piece of the overall pattern that directly involved the Johnston defendants did not have "a built-in end point."  Moreover, the casinos have alleged with particularity that the 2006 and 2008 bribery episodes were part of a larger course of conduct in which Blagojevich systematically solicited payments from persons and entities seeking benefits from Illinois state government in a wide-ranging pay-to-play scheme.

In any event, "[t]he lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by arrest [or] indictment," *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991), which is precisely what the casinos allege took place here.  The alleged predicate acts involved, at a minimum, bribery under Illinois law as well as federal fraud offenses; they occurred over periods of one to two months in 2006 and in 2008; they had multiple victims even if

---

[2]  The Court disagrees with the Johnston defendants' contention that it should disregard the allegations concerning the passage and signature of the 2006 Racing Act because the casinos allege them on information and belief.  Allegations based on information and belief are permissible when they concern "facts inaccessible to the plaintiff," so long as the plaintiff "plead[s] the grounds for his suspicions."  *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir. 1992).  The facts in question – involving acts pursuant to a covert criminal scheme – are quite obviously inaccessible to the casinos without discovery, and casinos have not simply alleged the grounds for their suspicions but have supported them with far more than is the norm for parties pleading matters on information and belief.

one considers only the four plaintiff casinos and not the other victims of Blagojevich's alleged pay-to-play scheme; and the plaintiffs suffered distinct injuries from the 2006 and 2008 Racing Acts. *See generally Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986) (factors considered to determine continuity for purpose of pattern requirement).

The Johnston defendants also argue that the casinos have failed to allege the requisite causation. The Court disagrees. "Proximate cause . . . is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2134 (2008) (internal quotation marks and citation omitted). The key factor is whether there is "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* The casinos allege in their complaint that the Johnston defendants conspired with others to make payments to Blagojevich in return for his agreement to sign, and not veto the two Racing Acts (and, perhaps, to importune legislators to vote for one or both of them), and that as a result, the Acts were adopted. *See* Compl. ¶ 64. Due to the adoption of the Acts, the casinos allege, they were required to pay around $89 million that they otherwise would not have had to pay. That is a sufficient allegation of proximate causation.

The Johnston defendants point out that plaintiffs have not specifically alleged that the Acts were conceived, drafted, or passed by the legislature as a result of the alleged scheme. Perhaps not (though this is not entirely clear concerning the issue of passage of the 2006 Racing Act, *see* Compl. ¶¶ 24-26), but that is not fatal to the allegation of proximate causation. As the casinos allege, Blagojevich could have

vetoed each Act, and if he had done so the legislation would not have taken effect absent a legislative override. The casinos have sufficiently alleged that their losses were "a foreseeable result" of the defendants' alleged wrongdoing, which is all that is required. *See Bridge*, 128 S. Ct. at 2143. Though a fact finder could draw the opposite inference, the casinos are not required to prove their case in their complaint, and they are entitled to have reasonable inferences drawn in their favor at this early stage of the case. *See Bissessur v. Ind. Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 696 (7th Cir. 2009).

For these reasons, the Court rejects the defendants' arguments for dismissal of the casinos' RICO claim.

## 2.    Constructive trust claim

In Count 2 of their complaint, the casinos seek a constructive trust over the approximately $89 million they have paid under the 2006 and 2008 Racing Acts, alleging that those funds were paid as a direct result of the RICO conspiracy. The racetracks, which are the defendants named in Count 2, have all moved to dismiss that claim.

Under Illinois law, "a constructive trust is imposed to prevent unjust enrichment by imposing a duty on the person receiving [a] benefit to convey the property back to the person from whom it was received." *Martin v. Heinold Commodities, Inc.,* 163 Ill. 2d 33, 56, 643 N.E.2d 734, 745 (2004). The racetracks argue that the constructive trust claim is precluded under either the *Rooker-Feldman* doctrine or the doctrine of claim preclusion; the Tax Injunction Act divests the Court of jurisdiction to hear the claim; the

Court should abstain from considering the claim under the *Colorado River* doctrine; and the claim is in any event premature.

### a.     Preclusion

### i.     *Rooker-Feldman*

Defendants argue that the casinos' claim for a constructive trust is barred by the *Rooker-Feldman* doctrine, which prohibits a federal district court from exercising jurisdiction over a claim seeking review of a state court judgment. *See generally Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005). The Supreme Court has emphasized the narrow scope of the *Rooker-Feldman* doctrine: it applies only to those cases where "state-court losers complain[ ] of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id*. at 284. "In short, the doctrine prevents a party from effectively trying to appeal a state-court decision in a federal district or circuit court." *Hukic v. Aurora Loan Servs.*, — F.3d —, 2009 WL 3878235, at *7 (7th Cir. Nov. 20, 2009).

In this case, however, the casinos are not challenging the state courts' rulings regarding the constitutionality of the Racing Acts. Though this suit, like the state court suits, concerns the two Racing Acts, the *Rooker-Feldman* doctrine does not

> stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."

*Exxon Mobil*, 544 U.S. at 293 (quoting *GASH Assocs. v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).  The casinos' claims are not barred by the *Rooker-Feldman* doctrine.

### ii.    Claim preclusion

Defendants argue that the casinos' constructive trust claim is barred by the doctrine of claim preclusion as a result of the judgments entered in the state court litigation over the 2006 Racing Act by the Illinois Supreme Court (in the original lawsuit) and the Will County court (on the section 2-1401 petition).  The Court disagrees.

Under the doctrine of claim preclusion, a final judgment on the merits of an action precludes the parties to that action and their privies from litigating claims that were or could have been raised in that action.  *Allen v. McCurry*, 449  U.S. 90, 93 (1980); *see also Anderson v. Chrysler Corp.*, 99 F.3d 846, 852 (7th Cir. 1996).  A state court judgment has the same preclusive effect in federal court that it would have in a court of the state in which it was rendered.  28 U.S.C. §1738; *Allen*, 449 U.S. at 96. The doctrine of claim preclusion prevents plaintiff from bypassing a state court judgment and attempting to relitigate the case in federal court.  *Brokaw v. Weaver*, 305 F.3d 660, 664 (7th Cir. 2002).

In order for claim preclusion to apply under Illinois law, the party arguing preclusion must show that in the earlier suit, there was a final judgment on the merits by a court of competent jurisdiction and that the two suits involve an identity of causes of action and an identity of parties or their privies.  *See, e.g., Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 335, 665 N.E.2d 1199, 1204 (1996).  If these requirements are

met, the judgment in the earlier suit bars "not only those matters which were actually litigated and resolved in the prior suit, but also any matter which might have been raised in that suit to defeat or sustain the claim or demand." *Id.* at 336, 665 N.E.2d 1205.

The racetracks have not shown the requisite identity of the parties. The casinos did not sue the racetracks in state court. Rather, because their claims involved the constitutional validity of the two statutes, they sued Illinois governmental authorities. The racetracks would not have been proper defendants in suits by the casinos over whether the statutes violated federal and Illinois constitutional requirements. The racetracks have cited no rule of Illinois law that would have required the casinos to join claims against Johnston or the racetracks arising from an alleged criminal fraud scheme in the same case as a constitutional challenge to the Racing Acts filed against the state authorities charged with collecting the assessments required by those Acts.

The racetracks argue that preclusion is appropriate because they intervened in the state court cases. Some, though not all, of the racetracks sued in this case intervened in the 2006 Racing Act case, and some intervened in the 2008 Racing Act case. As the casinos point out, however, Arlington Park, the party whose brief asserts the claim preclusion argument, effectively manufactured the "same parties" argument by intervening in both cases *after* the present suit was filed. And Balmoral Park and Maywood Park intervened in the 2008 Racing Act case even later, after they had already filed their motion to dismiss in the present case. The Court has found no basis in the law for a claim preclusion rule that effectively would permit a party to force preclusion of a suit filed against that party in federal court by intervening in a related state court case.

14

In any event, even if the racetracks had established all of the requirements for claim preclusion, it would not bar the constructive trust claim against them (which derives from the RICO claim). The claim against the racetracks was not actually resolved in the state court suit, nor could it have been raised in that suit. The casinos were unaware of the facts underlying their current claims while the suit over the 2006 Racing Act was pending in the state trial court or the Illinois Supreme Court. Claim preclusion does not apply to claims that a party did not know about and could not have known about at the time of the prior suit. *See Himel v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 596 F.2d 205, 210 (7th Cir. 1979).

By the time the casinos filed their section 2-1401 petition to vacate the judgment in the case over the 2006 Racing Act, of course, they were aware of at least some of the facts underlying their pay-for-play allegations, and they alleged those facts as a basis for vacating the earlier judgment in that case. But success on that section 2-1401 petition would have done nothing more than reopened the casinos' constitutional challenge to the statute. A section 2-1401 petition is designed to address facts not part of the record that, if known, would have prevented entry of the original judgment. *See, e.g., Prenam No. 2, Inc. v. Village of Schiller Park*, 367 Ill. App. 3d 62, 65, 854 N.E.2d 738, 742 (2006). It is not a vehicle for asserting entirely new legal claims against different parties. The racetracks have cited no authority suggesting that an Illinois trial court would have entertained, as part of a section 2-1401 petition like the one the casinos filed in the 2006 case, entirely new claims against parties the petitioner had not sued in the underlying case. They have failed to show that the current claim is one that the casinos could have brought as part of the section 2-1401 petition.

In any event, under Illinois law regarding claim preclusion, a judgment is not final – and thus not preclusive -- until the possibility of appellate review has been exhausted. *See, e.g., Fidelity Nat'l Title Ins. Co. of N.Y. v. Westhaven Props. P'ship*, 386 Ill. App. 3d 201, 211, 898 N.E.2d 1051, 1061 (2007). That has not yet happened with respect to the denial of the casinos' section 2-1401 petition.[3]

### iii. Tax Injunction Act

The racetracks argue that the Tax Injunction Act (TIA), 28 U.S.C. § 1341, divests the Court of jurisdiction over the constructive trust claim. The TIA provides that "the district courts shall not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under State law where a plain, speedy, and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The limitation that the TIA imposes is considered to be jurisdictional in nature. *See, e.g., Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 582 (7th Cir. 1999).

The revenue collected under the 2006 and 2008 Racing Acts is not referred to in those statutes as a tax. And it does not operate in the way one ordinarily would understand a tax to operate. The funds collected under those Acts are passed through to the racetracks within ten days of receipt by the Horse Racing Equity Trust Fund. 230 ILCS 5/54.5. The state cannot use the funds at all. *Id.; see also* 30 ILCS 105/8h (funds from the Horse Racing Equity Trust Fund cannot be transferred to the general revenue fund to help defray the state's operating expenses). And the Act particularly benefits

---

[3] The same is true of the Will County trial court's decision dismissing the casinos' suit over the 2008 Act. Thus assuming that decision might be claim-preclusive in this case – a question the Court need not decide – the finality requirement of Illinois claim preclusion law has not yet been satisfied.

one group of entities – the racetracks and owners of racehorses.

All of that said, whether a charge is considered a tax for purposes of the TIA is not "a question solely of *where* the money goes[.] The issue is *why* the money is taken." *Hager v. City of West Peoria*, 84 F.3d 865, 870 (7th Cir. 1996) (emphasis in original). The Illinois legislature made findings that the riverboat gaming industry had a negative impact on the Illinois horse racing industry; it determined that the decline of horse racing hurt Illinois residents employed by that industry; and passage of the Acts would create additional jobs. *See* Ill. Pub. Act 94-804 § 1 (2006). And the Illinois Supreme Court, in its decision upholding the 2006 Racing Act against the casinos' constitutional challenges, repeatedly referred to the Act as imposing a "tax," and it specifically found that the Act serves a public purpose.

Characterizing the Acts as imposing a tax for TIA purposes is consistent with the standard employed by a majority of circuits, which have held that an assessment is a tax if it "is for revenue raising purposes," regardless of whether the proceeds go to a general fund or are devoted to a more specialized purpose. *See Schneider Transp., Inc. v. Cattanach*, 657 F.2d 128, 132 (7th Cir. 1981) (vehicle registration fees deposited into fund used for transportation purposes, including highway construction, is a tax for TIA purposes); *see also Wright v. McClain*, 835 F.2d 143, 145 (6th Cir. 1987) (collecting cases). The assessments on the casinos raised revenue that the Illinois legislature chose to devote to assisting the Illinois horse racing industry. Though the question is not free from doubt, the Court concludes that the racetracks have shown that the assessments imposed by the 2006 and 2008 Racing Acts are taxes for purposes of the

TIA.

For the TIA to apply, the racetracks must also prove that the casinos seek to "enjoin, suspend, or restrain the assessment, levy, or collection of any tax under State law. 28 U.S.C. § 1341. The TIA's purpose is to divest district courts of subject matter jurisdiction when the relief sought "would diminish or encumber state tax revenue." *Scott Air Force Base Props., LLC, v. County of St. Clair*, 548 F.3d 516, 520 (7th Cir. 2008). Although the statute makes specific reference to actions that would affect the assessment, levy, or collection of a tax, it applies to suits seeking a refund of taxes already paid. *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 512 (1981); *see also Wright v. Pappas*, 256 F.3d 635, 636 (7th Cir. 2001).

The casinos argue that they do not seek to enjoin, suspend, or restrain the tax but rather seek to prevent the racetracks from spending ill-gotten gains from an unlawful conspiracy. They point out that they are not here contesting the constitutionality of the Racing Acts and are not seeking a refund from the state of Illinois. The racetracks counter that if the casinos succeed on their constructive trust claim, the money collected under the 2006 and 2008 Racing Acts will be returned to the casinos, effectively giving them a refund and eliminating the tax.

The TIA withdraws federal jurisdiction not only over direct challenges to state taxes but also over actions that indirectly restrain the assessment, levy, or collection of taxes. *RTC Comm. Assets Trust 1995-NP3-1v. Phoenix Bond Indem. Co.,* 169 F.3d 448, 454 (7th Cir. 1999). The casinos' constructive trust claim poses this kind of indirect challenge to the underlying state tax by seeking, in effect, a refund of the taxes the casinos have paid under the 2006 and 2008 Racing Acts. Were the casinos to

prevail on their constructive trust claim, they would get back the money they paid out under the Racing Acts, and it would be as if the assessments that the Acts impose had never been made. This constitutes the sort of challenge to a state tax that the TIA withdraws from federal district courts.

A federal court is not divested of jurisdiction over a challenge to a state tax unless there is a "plain, speedy and efficient remedy" available to the plaintiff in state court. 28 U.S.C. § 1341. The Supreme Court has held that such a remedy must offer a "full hearing and judicial determination of the controversy." *Rosewell*, 450 U.S. at 514. To qualify, a remedy must include the opportunity to appeal to higher courts and may not preclude preservation or consideration of a plaintiff's federal rights. *Id.* at 514-15. The "plain, speedy and efficient remedy" exception, however, is construed narrowly. *California v. Grace Brethren Church*, 457 U.S. 393, 411 (1982). The remedy available to a plaintiff need not "the best one conceivable." *Scott Air Force Base Props.*, 548 F.3d at 522 (7th Cir. 2008). A court need only determine that the remedy "meets certain minimal *procedural* criteria." *Rosewell*, 450 U.S. at 512 (emphasis in original).

A plaintiff objecting to the invocation of the TIA's jurisdictional bar "bears the burden of demonstrating the insufficiency of the remedy available in the state court system." *Scott Air Force Base Props.*, 548 F.3d at 521. Defendants argue that the Protest Monies Act provides such a remedy. *See* 30 ILCS 230/2a. It is not clear whether the casinos' challenge would fall within the purview of that statute. But if the casinos' constructive trust claim constitutes a challenge to the tax imposed by the Racing Acts, as the Court has held, it is beyond dispute that the casinos could bring

that claim in state court (a state court certainly would be no less able than a federal court to grant the casinos relief on a state-law claim).  Their ability to do so eliminates any possibility that a plain, speedy and efficient state remedy is lacking.  *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 (1981) (ability to bring asserted claims under 42 U.S.C. § 1983 in state court satisfied requirements of TIA).[4]

For these reasons, the Court concludes that it lacks jurisdiction over the casinos' constructive trust claim.  The Court therefore grants the racetracks' motion to dismiss Count 2 of the casinos' complaint.  Because Count 2 forms the sole basis for the casinos' motion for preliminary injunction, the Court denies that motion.

### Conclusion

The Court denies defendants' motions to dismiss [docket nos. 32, 38, 42, 43 & 46] with regard to Count 1 of plaintiffs' complaint but dismisses Count 2 for lack of subject matter jurisdiction.  The defendants named in Count 1 are directed to answer that claim on or before January 4, 2010.  The Court denies plaintiffs' motion for preliminary injunction [docket no. 59] and dissolves the temporary restraining order previously entered.  On the Court's motion, the dissolution of the temporary restraining order is stayed through the close of business on December 14, 2010, to permit plaintiffs

---

[4]  In arguing that state remedies are insufficient, the casinos point to their recent unsuccessful attempt to persuade the Circuit Court of Cook County to freeze the proceeds of the Racing Act assessments pending resolution of the present case.  That misses the point.  The problem appears to have been that the state court believed that any attempt to freeze those funds should be pursued in the same court in which the casinos' underlying challenge was pending – namely, this Court.  The state court's adverse ruling does not suggest that the casinos could not pursue in state court the same constructive trust claim they have asserted here.

to seek a stay from the court of appeals.  The case is set for a status hearing on

January 14, 2010 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  December 7, 2009