IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EMPRESS CASINO JOLIET CORP., DES PLAINES DEVELOPMENT LTD. P'SHIP, HOLLYWOOD CASINO-AURORA, INC., and ELGIN RIVERBOAT RESORT-RIVERBOAT CASINO,<br><br>Plaintiffs,<br><br>vs.<br><br>ROD BLAGOJEVICH, FRIENDS OF BLAGOJEVICH, JOHN JOHNSTON, BALMORAL RACING CLUB, INC., MAYWOOD PARK TROTTING ASS'N, INC., ARLINGTON PARK RACECOURSE, LLC, FAIRMOUNT PARK, INC., and HAWTHORNE RACE COURSE, INC.,<br><br>Defendants. | Case No. 09 C 3585 |

**CORRECTED**
**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case own and operate riverboat gambling casinos in Illinois. They have sued former Illinois governor Rod Blagojevich, his campaign committee Friends of Blagojevich (FOB), five entities that operate horse racing tracks in Illinois (Balmoral Park, Maywood Park, Arlington Park, Fairmount Park, and Hawthorne), and John Johnston, the owner of Balmoral Park and Maywood Park. Plaintiffs allege that defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), by conspiring to exchange campaign contributions for state action. Defendants have moved for summary judgment on plaintiffs' RICO claim. For the

reasons stated below, the Court grants defendants' motion.

**Background**

Defendants Balmoral Racing Club, Inc. (Balmoral) and Maywood Park Trotting Association, Inc. (Maywood) are harness racing tracks located in Crete and Melrose Park, Illinois, respectively. The Johnston family, including defendant John Johnston, owns Balmoral and Maywood. Plaintiffs are four riverboat casinos located in metropolitan Chicago. Plaintiffs and the racetracks compete against one another in the gambling market.

In 2003, Rod Blagojevich became the Governor of Illinois. Alonzo Monk, Blagojevich's chief of staff, testified during his deposition in this case that Christopher Kelly, Blagojevich's fundraiser, implemented a broad scheme of trading state action for campaign contributions. According to plaintiffs, this scheme involved the enactment of two legislative acts (the 2006 and the 2008 Racing Acts), which assessed a tax on Illinois casinos, the proceeds of which were deposited into a fund and distributed to Illinois horse racing tracks. Plaintiffs contend that defendants had a *quid pro quo* arrangement with Blagojevich to contribute money to his campaign in exchange for ensuring adoption of the Racing Acts.

It is undisputed that neither Blagojevich nor anyone on his staff helped draft the 2006 Act. Representative Robert Molaro, who sponsored the 2006 and 2008 Racing Acts, testified that he developed the casino tax concept because other states had enacted similar legislation. Specifically, when asked whether he was familiar with New Jersey's legislation, Representative Molaro explained, "[t]hat's where I got the idea." Molaro Dep. at 137-138.

Defendants vigorously advocated for passage of the 2006 Racing Act. Nevertheless, the 2006 Racing Act failed to pass the legislature three times – once in 2005 and twice in March 2006. Various legislators objected to the law on public policy grounds, explaining that it was unfair to tax one industry for another competing industry's benefit. In April 2006, however, several legislators changed their position in support of the 2006 Racing Act. Representative William Black said the following on the floor of the Illinois General Assembly:

> [W]hen one of your staffers comes up in an excited voice and says, "Representative, the Governor and the Speaker want you to come down to the Governor's Office right now." Well, I'm sure she didn't go down there to be told what a wonderful job the House of Representatives is doing. You know the love that the Governor has for all of us. I know why she went down there, ya get the Roll Call and ya look at 14, 15, 16 people that changed from "no" to "yes" on the Amendment. It might be interesting in the unlimited debate if somebody will tell us, what's the deal . . . Don't we ever learn anything around here? Haven't ya heard the U.S. Attorney saying there should be no quid pro quo in Illinois politics? Then what's going on? Why are some of you called down to the Governor's Office, then you come back up and you change your vote? You voted "no" twice on this Bill. You're gonna tell me this has changed so dramatically that all of a sudden you're gonna vote 'yes'? Well, Mr. U.S. Attorney in Chicago, get your subpoenas out because I guess we're never gonna learn anything in the State of Illinois. You wanna change your vote because you've suddenly grown fond of horses, that's fine, but I don't think that's the reason some of you changed your vote.

Pls.' Ex. 48 at 63-64. Representative Brent Hassert also stated: "[T]he Governor has weighed in on this . . . heavily in the last night or so, calling and asking people to vote for this. In my understanding from some of the, and actually hearing from somebody from your aisle, that there's promises have been made to support this Bill. . . . There's been a lot of switchin'." *Id.* at 68. The legislation passed. On May 26, 2006, one day after receiving the bill, Blagojevich signed the 2006 Racing Act into law.

On June 15, 2006, Johnston signed a letter thanking Blagojevich for his support.

3

Shortly thereafter, in late June 2006, Johnston made contributions to FOB totaling $125,000. Johnston divided the campaign contributions among multiple horse racing entities that he controlled. He admitted during his deposition that Kelly was the person with whom he dealt in Blagojevich's office and FOB regarding fundraising.

The 2006 Racing Act provided that the casino tax would expire on May 26, 2008. Defendants thus began seeking an extension of the 2006 Racing Act in 2007. At that time, Monk had resigned as chief of staff to pursue a career as a lobbyist. Although he no longer worked in an official capacity for the Blagojevich administration, he continued to serve as a primary fundraiser for Blagojevich's re-election campaign and replaced Kelly as Blagojevich's fundraising contact with Johnston. Johnston simultaneously hired Monk for $12,500 per month to lobby on behalf of Balmoral and Maywood. The record reveals that Johnston paid lobbyists Tom Cullen and Jeffrey Glass $1,000 and $2,500 per month, respectively. Johnston testified that he paid Monk more because of Monk's "level." Johnston Dep. at 105.

In April 2008, Johnston met with Blagojevich to discuss extending the Racing Act. At the meeting, Blagojevich did not express his position or support for the horse racing industry, saying only: "Appreciate your support in the past; hope you can continue to support me in the future." *Id.* at 121. Johnston did not make a contribution to FOB at that time. That summer, the 2008 Racing Act – which would renew the 2006 Racing Act for three years – failed each time it was presented to the legislature.

In September 2008, while the 2006 Racing Act was again up for renewal, Blagojevich placed a phone call to Johnston in Monk's presence to solicit campaign funds. Monk testified that when Blagojevich hung up the phone and Monk asked for the

4

result of the call, Blagojevich "said something to the effect that [Johnston] would be good for a hundred thousand." Monk Dep. at 59. One of Monk's fundraising documents dated September 12, 2008 lists next to Johnston's name $100,000 as the "goal" and October as the "event." *See* Pls.' Ex. 30. Monk explained that October was "when [they] thought that [Johnston's] donation would be made." Monk Dep. at 57.

Monk testified that in the weeks leading up to the legislature's vote on the 2008 Racing Act, he had numerous conversations with Johnston about "when [Johnston] would be making the hundred thousand dollar contribution that he had talked to the Governor about." *Id.* at 66. Reporting to Blagojevich about the status of Johnston's donation, Monk stated that Johnston had repeatedly said that he was "good for it" and that he was "just tryin' to figure out the different sources to get it." Pls.' Ex. 31 at 3; Pls.' Ex. 32; Monk Dep. at 70-72.

On November 20, 2008, the 2008 Racing Act passed both the House and the Senate by a veto-proof majority. Blagojevich received the bill for signature on November 24, 2008. Not having received Johnston's donation, however, Blagojevich delayed signing the bill. When Johnston learned of this delay through a report that he received via e-mail, he responded: "This is getting goofier. We are going to have to put a stronger bit in his mouth!?!" Pl.'s Ex. 36. Johnston also complained to Monk that he was losing $9,000 each day that the 2008 Racing Act was not signed.

On December 3, 2008, Monk and Blagojevich met to discuss how to get the $100,000 from Johnston. Immediately afterwards, Monk met with Johnston and delivered a message that Johnston had to pay $100,000 if he wanted Blagojevich to sign the 2008 Racing Act. Johnston testified that he responded angrily and "showed

5

[Monk] the door." Johnston Dep. at 162-63. Monk, however, stated that Johnston responded to his message by saying "[s]omething to the extent of I'm good for it." Monk Dep. at 119-122. Five days later, Blagojevich was arrested and indicted on federal charges of engaging in racketeering conspiracy, mail and wire fraud, and attempted extortion.

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment must be granted "[i]f no reasonable jury could find for the party opposing the motion." *Hedberg v. Ind. Bell. Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

Defendants have moved for summary judgment on plaintiffs' RICO claim. They argue that plaintiffs have failed to offer any evidence showing that defendants conspired with Blagojevich to violate RICO by trading campaign contributions for state action. Defendants further contend that even if there is sufficient evidence of a *quid pro quo*, (1) plaintiffs cannot establish that defendants' alleged RICO violations proximately caused plaintiffs' injuries, (2) plaintiffs' claims are barred by the Supreme Court's decision in *Fletcher v. Peck*, and (3) the First Amendment protects their alleged bribery scheme. The Court deals first with the latter two arguments.

6

**1.     *Fletcher v. Peck***

Defendants contend that plaintiffs' RICO claim is barred by the Supreme Court's decision in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L. Ed. 162 (1810).  In *Fletcher*, Georgia legislators – all but one of whom was bribed – passed a law granting a tract of land to persons who then sold it to innocent purchasers.  The legislators who had passed the statute were ousted, and the following year, the new legislature voided the law and declared all rights and claims under it to be invalid.  The plaintiff, an innocent purchaser, filed suit.  Addressing the constitutionality of the new legislation, the Supreme Court held "that a court may not invalidate legislation based on the improper motives of the legislators who enacted it." *United States v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 573 F.2d 400, 412 (7th Cir. 1978) (summarizing *Fletcher*).  Since then, *Fletcher* has been applied in cases involving a facial challenge to a statute where the issue is "what role a government body's motive plays in constitutional analysis." *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1290 (7th Cir. 1996) (facial challenge to policy prohibiting private displays); *see also Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d at 412 (facial challenge to order requiring busing of minority students).

Plaintiffs in this case have brought a RICO claim seeking damages, not a facial challenge to the Racing Acts.  They do not seek to strike down a law as unconstitutional based on legislative intent.  Rather, plaintiffs seek only damages against the defendants who allegedly committed crimes and were enriched to plaintiffs' detriment.  Defendants have offered no authority, nor has the Court located any, indicating that *Fletcher* bars such a claim. *Cf. Noerr Motor Freight, Inc. v. E. R.R. Presidents Conference*, 155 F.

7

Supp. 768, 820 (E.D. Pa. 1957) (*Fletcher* not applicable in antitrust case where "plaintiffs do not seek to invalidate any legislation"), *rev'd on other grounds*, 365 U.S. 127 (1961).

## 2.     *Noerr-Pennington* immunity

Defendants argue that their interactions with the Blagojevich administration are immunized from liability under the *Noerr-Pennington* doctrine.  *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (holding that railroads' publicity campaign to promote support for laws harmful to trucking interest was immune from antitrust liability); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) (joint efforts by miners' union and large coal companies to have federal agency impose higher minimum wage for coal suppliers to Tennessee Valley Authority were immune from antitrust liability).  The *Noerr-Pennington* doctrine, which originated in antitrust cases, is rooted in the Petition Clause of the First Amendment, under which those who petition the government for redress are generally immune from statutory liability for such activity.  *See, e.g., California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) (*Noerr-Pennington* protects "rights of association and of petition"); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889-90 (10th Cir. 2000) (explaining that outside the antitrust context, *Noerr-Pennington* immunity "derives from the right to petition"); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 327 (3d Cir. 1999) ("[T]he purpose of *Noerr-Pennington* as applied in areas outside the antitrust field is the protection of the right to petition.").

Although the doctrine is broad, it does have limits.  "The First Amendment

protections enshrined in the *Noerr-Pennington* [d]octrine protect those petitioning the government, but do not provide immunity to individuals who are accused of bribing government officials." *Bagley v. Blagojevich*, 685 F. Supp. 2d 904, 910 (C.D. Ill. 2010), *aff'd on other grounds*, 646 F.3d 378 (7th Cir. 2011). Although the Seventh Circuit has not applied the *Noerr-Pennington* doctrine outside the antitrust context, it has suggested that it would apply if the conduct consisted of mere petitioning. *See Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (directing dismissal of RICO claim against tobacco companies on other grounds, but noting that *Noerr-Pennington* could apply if tobacco advertising was deemed a petition to Congress). Other circuits have declined to extend the *Noerr-Pennington* doctrine where petitioning activities are accompanied by illegal or fraudulent actions. *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) ("Neither the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation.") (internal quotation marks omitted); *Tal v. Hogan*, 453 F.3d 1244, 1260 (10th Cir. 2006) ("[*Noerr-Pennington*] immunity does not encompass fraudulent or illegal actions."); *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 693 F.2d 733, 746 (8th Cir. 1982) ("The *Noerr-Pennington* doctrine was not intended to protect those who employ illegal means to influence their representatives in government.") (internal quotation marks omitted). As such, "[a]ttempts to influence governmental action through overtly corrupt conduct, such as bribes . . . are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*." *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) (internal quotation marks omitted).

9

Plaintiffs have provided evidence of defendants' involvement in a scheme to make campaign contributions in exchange for Blagojevich ensuring adoption of the Racing Acts. Specifically, plaintiffs have provided sufficient evidence for a reasonable jury to find that defendants used bribery to "petition" Blagojevich. Such actions fall outside of the protections afforded under the *Noerr-Pennington* doctrine. Because plaintiffs' claim, to succeed, requires proof of "a corrupt conspiracy, not mere advocacy," defendants are not entitled to *Noerr-Pennington* immunity. *Bagley*, 685 F. Supp. 2d at 910.

**3.   RICO**

    **a.   Enterprise and pattern requirements**

Proof of a racketeering conspiracy requires a showing that the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and further agreed that someone would commit at least two predicate acts of racketeering to accomplish those goals. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011); *see* 18 U.S.C. § 1962(d).

Defendants contend that there is no evidence of an "enterprise" or of a "pattern" of racketeering acts. A RICO "association-in-fact" enterprise can be formal or informal, but it requires some type of organizational structure with goals separate from the predicate acts themselves. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009); *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000). Proof of a pattern of racketeering activity requires that the predicate criminal acts be related to each other and amount to or pose a threat of continued criminal activity. *See, e.g., H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Gamboa v. Velez*, 457

F.3d 703, 705 (7th Cir. 2006). There is no "hard and fast set rule" for determining whether predicate acts constitute a pattern of racketeering; the analysis is factually-oriented and varies from case to case. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 977 (7th Cir. 1986).

Plaintiffs have offered evidence from which a reasonable jury could find that there was an enterprise and a pattern of racketeering activity. Monk testified during his deposition that between 2003 and 2008, he and others participated with Blagojevich in an organized effort to trade state action for campaign contributions. For instance, Monk testified that in 2008, he was involved in a scheme with Blagojevich to withhold gubernatorial support for tollway construction until a particular contractor obtained $500,000 in campaign contributions for FOB. He also recalled how Blagojevich instructed his deputy governor to delay funding that the State of Illinois was to provide Children's Memorial Hospital until Blagojevich and FOB received a campaign contribution from the hospital. Additionally, Monk testified to the formation, method, and means of an enterprise, explaining that Kelly provided the idea in 2002; the participants included himself, Blagojevich, Kelly, and Antoin Rezko; and all of the participants involved helped to extract money from donors in exchange for state action. This evidence would permit a reasonable jury to find the existence of an association-in-fact enterprise consisting of Blagojevich, FOB, and (among others) the other participants identified above, which had an ongoing organizational structure and the goal of perpetuating Blagojevich's tenure in office and enriching him and others involved in the enterprise.

The evidence summarized above also would permit a reasonable jury to find a

pattern of racketeering activity as that term is defined under the RICO statute. Monk testified during his deposition that the enterprise's participants engaged in, among other things, the commission of at least two predicate acts alleged in the present case, specifically, promises to exchange campaign contributions for passage of the 2006 and 2008 Racing Acts. Because the 2008 Racing Act had an expiration date, it is reasonable to infer that the defendants' alleged conduct would have continued into the future had Blagojevich and his confederates' criminal conduct had not been uncovered by law enforcement.

Defendants argue that there is insufficient evidence for a reasonable jury to conclude that defendants agreed to pay campaign contributions in exchange for Blagojevich to secure the Racing Acts' enactment in 2006 and 2008. *See DeGuelle*, 664 F.3d at 204 (requiring evidence that defendant agreed that someone would commit at least two predicate acts to participate in the affairs of an enterprise). "A conspiracy to violate RICO may be shown by proof that the defendant, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty.*, 424 F.3d 659, 674 (7th Cir. 2005) (internal quotation marks and brackets omitted).

With respect to the 2008 Racing Act, plaintiffs have provided direct evidence of a *quid pro quo*. For instance, both Monk and Johnston testified during their depositions that Monk delivered a message (and Johnston understood) that Blagojevich would not sign the bill until Johnston contributed $100,000 to his campaign. It is disputed, however, whether Johnston turned Monk down. *See* Monk Dep. at 119-21 (stating that

Johnston replied with "[s]omething to the extent of I'm good for it"). Further, when forwarding a report via e-mail that stated that Blagojevich's signature on the 2008 Racing Act might not be forthcoming for weeks, Johnston wrote: "This is getting goofier. We are going to have to put a *stronger* bit in his mouth!?!" Pl.'s Ex. 36 (emphasis added). A reasonable jury could find such evidence sufficient to prove an agreement between defendants and Blagojevich to pay campaign contributions in exchange for adoption of the 2008 Racing Act.

Plaintiffs have no direct evidence that an agreement existed regarding the 2006 Racing Act. They rely on circumstantial evidence. "Conspiracies, like other crimes, may be proved entirely by circumstantial evidence." *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991). The Court need not address the sufficiency of this evidence, however, because proximate cause is lacking even if plaintiffs can meet the other requirements for RICO liability.

### b. Proximate cause

Defendants argue that even if plaintiffs have provided sufficient evidence that defendants participated in a RICO conspiracy with Blagojevich, they cannot establish the requisite causation. A party making a RICO claim must demonstrate that the RICO violation was not only a "but for" cause of his injury but also a proximate cause of his damages. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006). In a RICO conspiracy case like this one, this requires the plaintiff to show that its injury was proximately caused by an overt act that was an act of racketeering or otherwise unlawful. *Beck v. Prupis*, 529 U.S. 494, 507 (2000).

"Proximate cause . . . is a flexible concept that does not lend itself to a black-

letter rule that will dictate the result in every case." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (internal quotation marks omitted). But there must be "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

The Court begins with the 2006 Racing Act. As evidence of causation, plaintiffs rely on the statements of Representatives Black and Hassert on the floor of the General Assembly, as well as other similar statements, to the effect that the governor's office was engaged in backroom dealings to get legislators to switch their votes to yes. They also rely on the fact that over a dozen legislators in fact changed their votes, thus giving the Act its margin of victory.

The statements that Black, Hassert, and other legislators made at the time, however, are inadmissible hearsay. They are offered to prove the truth of the matter asserted in the statements, *see* Fed. R. Evid. 801(c), namely that Blagojevich and others associated with him had induced and were inducing legislators to vote in favor of the Act. Plaintiffs offer no hearsay exception that would permit admission of the statements, nor can the Court come up with one.[1] For example, to be admitted as a present sense impression under Federal Rule of Evidence 803(1), the out-of-court statement must describe an event or condition "without calculated narration," the speaker must have perceived the event or condition himself, and speaker must make the statement while perceiving the event or condition, or immediately thereafter. *See United States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001). Plaintiffs cite nothing to suggest that any of these requirements are met. To be admissible as an excited

---

[1] It is conceivable that the record of the legislative proceedings, including the representatives' statements on the General Assembly floor, may be a public record within the meaning of Rule 803(8), but that does not eliminate the need to show an exception for hearsay statements contained within that record. *See* Fed. R. Evid. 805 (hearsay within hearsay).

utterance under Rule 803(2), there must be a startling event or condition, the declarant must make the out-of-court statement while under the stress of excitement caused by the event or condition, and the statement must relate to that event or condition.  *See, e.g., United States v. Moore*, 791 F.2d 566, 570 (7th Cir. 1986).  Again, plaintiffs have offered nothing indicating that these requirements are met.  Thus the Court cannot consider this evidence in assessing whether a reasonable jury could make a finding of proximate cause.  *See, e.g., Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (court may consider only admissible evidence in assessing a motion for summary judgment).

      The exclusion of this evidence leaves only the temporal connection between the alleged concluding of the *quid pro quo* deal with Blagojevich and the legislature's passage of the 2006 Act shortly thereafter, which occurred after several legislators who had previously voted no voted for passage of the legislation.  No reasonable jury could find the requisite proximate cause.  The claimed causal link between the alleged bribe and the crime is attenuated.  There is, for example, no evidence suggesting that Blagojevich or anyone associated with him offered any improper inducements to legislators who changed their votes.  And although there is certainly evidence that Blagojevich and others associated with him were spurred by the alleged bribe to persuade legislators to adopt the legislation, there is no evidence of the legislators' motivations.  For all anyone knows, the legislators who decided to vote yes were persuaded by logic, reason, and considerations of sound public policy.  "The element of proximate causation . . . is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation."  *Anza*, 547 U.S. at 460.

Plaintiffs have even less evidence of proximate cause with regard to the 2008 Racing Act. Plaintiffs have offered no evidence that Blagojevich or others acting on his behalf influenced legislators to vote for this legislation. And although plaintiffs have offered evidence that Blagojevich traded his signature on the legislation for Johnston's $100,000 contribution, they have not offered evidence that would permit a reasonable jury to find that this was a proximate cause of the 2008 Act's adoption. Defendants note that the legislation passed both the House (83-28) and the Senate (37-13) by a "veto-proof" majority and that Blagojevich's signature on the bill was thus unnecessary to the Act's adoption. Under the Illinois Constitution, a bill becomes law despite a veto by the governor if each house of the General Assembly passes it again by a three-fifths vote. *See* Ill. Const. art. IV, § 9(c)-(e) (regarding veto procedures). In the abstract, there is probably no such thing as a "veto-proof" majority, because there is nothing to prevent a legislator from changing his or her vote following a veto, and opposition by the governor may influence some legislators to do just that. But whether that will occur in any given case is speculative. In this situation, plaintiffs have done nothing to remove this from the realm of speculation. Given the significant margin of passage and the absence of evidence of any attempt by Blagojevich to influence the legislature, there is insufficient evidence to permit a reasonable jury to find that the alleged Blagojevich-Johnston *quid pro quo* regarding the 2008 Racing Act was a proximate cause of its adoption and thus of injury to plaintiffs.

Plaintiffs' failure to provide evidence from which a jury reasonably could find proximate cause is fatal to their RICO conspiracy claim. Defendants are entitled to summary judgment.

**Conclusion**

For the foregoing reasons, the Court grants defendants' motion for summary judgment [docket no. 237] and directs the Clerk to enter judgment in favor of defendants. The trial date of November 4, 2013 is vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 7, 2013
(corrected version
issued August 19, 2013)