**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EMPRESS CASINO JOLIET CORP., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09 C 3585** |
| | ) | |
| **JOHN JOHNSTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON MOTIONS IN LIMINE

This case is set for a jury trial starting on December 1, 2014.  The Court held a final pretrial conference on November 25-26, 2014 and heard arguments on the parties' motions *in limine*.  These motions had previously been the subject of extensive briefing. This order sets forth the Court's rulings on the motions.

### Defendants' motions *in limine*

**1.     Pre-2008 conduct**

Plaintiffs' claims in this case all turn on a common contention:  in 2008, Johnston, who owned or controlled two Illinois horse racing tracks, entered into an agreement to make a contribution to Governor Rod Blagojevich's campaign fund in return for Blagojevich supporting and signing legislation that imposed a tax on certain Illinois casinos and put the funds into a trust for the benefit of the Illinois horse racing industry.

Plaintiffs previously made similar contentions regarding the 2008 Racing Act's predecessor, adopted in 2006.  The Seventh Circuit ruled, however, that "[t]he Casinos have not pointed to evidence that would allow a factfinder to conclude that the

Racetracks' alleged bribery scheme caused the legislature to pass the '06 Act."

*Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 729 (7th Cir. 2014).  More

specifically, the Court stated:

> Evidence is similarly lacking to support a finding that the Racetracks bribed
> Governor Blagojevich to sign the '06 Act into law.  The Casinos point to a
> meeting between Johnston and Blagojevich's aide Chris Kelly in 2006 while
> the Act was stalled in the legislature.  But they provide no evidence that
> Johnston offered Kelly a bribe in exchange for Governor Blagojevich's
> signature during that meeting.  The letter from the Racetracks to
> Blagojevich after the '06 Act passed merely thanked him for his support; it
> did not suggest that Blagojevich had agreed to sign the bill in exchange for
> a bribe. The fact that the Racetracks later made campaign contributions
> cannot, without more, support liability for acts of political corruption.

*Id.* at 731.  Following remand, this Court ruled that the Seventh Circuit's determination

"precludes reliance on the allegedly illegal conduct involving the 2006 statute to provide

RICO predicate acts."  Order of Oct. 24, 2014 at 9 (dkt. no. 295).  In the same order,

however, the Court stated that it "need not and does not address at this point whether

evidence about this conduct might be admissible for other purposes."  *Id.*

Defendants have now moved to bar "any evidence of Defendants' conduct

relating to the 2006 Act, including Defendants' history of political donations and lobbying

efforts, and meetings with Blagojevich fundraiser Christopher Kelly."  Defs.' Mots. In

Limine at 2.  The Court grants this motion in part.  First, the Court previously barred

plaintiffs from contending that defendants bribed Blagojevich in connection with the

2006 Act.  Second, the upshot of the Seventh Circuit's ruling quoted above is that

evidence of defendants' contacts with Kelly relating to the 2006 Act is likewise

inadmissible.  Third, the Court reaches the same conclusion regarding evidence of

lobbying concerning the 2006 Act; such evidence is excluded.

This does not mean, however, that all "[e]vidence of Defendants' [c]onduct [p]rior

to 2008" is inadmissible, as defendants expansively propose in a heading in their motion *in limine* and as they seemed to contend at the final pretrial conference. Nothing about the Seventh Circuit's ruling suggests that nothing that happened prior to 2008 is relevant. In fact, plaintiffs have persuasively argued that the following pre-2008 evidence is relevant and admissible:

- First, the fact that Blagojevich the 2006 Act the day after it was presented to him is admissible. In 2008, Blagojevich delayed signing the Act. Plaintiffs contend, with some supporting evidence, that he did so in order to verify that the promised payment was coming in. The delayed signature is part of the circumstantial evidence that supports plaintiffs' contention regarding the bribery scheme, and the fact that Blagojevich treated the 2008 Act differently from the 2006 Act tends to support the inference that plaintiffs want to draw from the delay. This evidence does not unfairly prejudice defendants in the least, as it does not bring into play any sort of claim or contention that the 2006 Act's signature or passage was the result of bribery.

- Second, the amount of money defendants received as a result of the 2006 Act (which was similar to the 2008 Act) is admissible. This is relevant evidence of a motive on defendants' part to ensure the passage of the 2008 Act. Again, defendants will not be unfairly prejudiced by this, because there will be no claim or contention that the 2006 Act was adopted as a result of bribery or other improper conduct.

- Third, evidence regarding the amounts of prior contributions by Johnston and his affiliated entities to Blagojevich's campaign funds is admissible. Plaintiffs offer a chart showing that from 2002 through 2007, these entities contributed a total of

$320,000.[1]  Plaintiffs' contention regarding the 2008 Act is that Johnston promised to make a $100,000 contribution in return for Blagojevich's support of and signature on the legislation.  (Ultimately, no contribution was made; Blagojevich signed the 2008 Act shortly after he was arrested on criminal charges.)  As plaintiffs have argued, the evidence that Johnston had been a major contributor in the past tends to support the notions that he would have agreed to make a significant contribution in 2008 and that Blagojevich and his agents would have sought a significant contribution from Johnston at that time.  As the Court put it during the final pretrial conference, "if we were talking here about somebody who had never made a contribution in the past to the Blagojevich campaign, then, you know, arguably it wouldn't have made any sense for there to have been these conversations about . . . getting a big contribution in 2008. . . .  The Blagojevich folks were aware that this was somebody who had made significant contributions in the past, which makes it all the more likely that there would have been some attempt to, you know, make a deal for a big contribution in the future."  Nov. 25, 2014 Tr. at 72-73.

Contrary to defendants' contention, this is not impermissible "propensity" evidence.  The Plaintiffs' evidence indicates that Johnston had a regular business practice—to put it another way, a habit—of making significant contributions to Blagojevich during his campaigns for and service as governor.  And there is and will be no suggestion that any of the prior contributions involved a *quid pro quo*.  The Court is

---

[1] The Court notes that the copy of the chart that it was provided has a "Government Exhibit" sticker on it, indicating that the chart may have been used during one or both of the trials in *United States v. Blagojevich*.  The parties are directed to remove any such references from the exhibits that are to be given or displayed to the jury in the present case.

willing to give an appropriate limiting instruction regarding the jury's consideration of this evidence and will leave it to defendants to propose one.

The Court overrules, however, plaintiffs' request to introduce evidence that the 2006 Act passed the legislature only after the third vote. They argue this evidence is relevant to show that defendants had reason to be concerned about the legislation's renewal in 2008, thus giving them a motive to agree to a *quid pro quo* with the governor. As the Court understands plaintiffs' claims, however, the focus of the case following the Seventh Circuit's decision involves the effort to procure the governor's signature on the legislation, not any effort to procure his assistance in getting the Act adopted by the legislature.

The Court likewise overrules plaintiffs' request to introduce evidence regarding defendants' contributions to former Illinois Governor James Edgar. These contributions were at a far lower level than their contributions to Blagojevich, and plaintiffs wish to highlight the contrast. Plaintiffs have not shown, however, that the underlying state of affairs regarding legislation affecting the casino and horse racing industries during Edgar's campaigns or tenure in office was similar to that which existed in 2008. For this reason, the two time frames are not sufficiently comparable to make the evidence relevant or to give it any significant probative value.

Lastly with regard to the issue of contributions, if state representative Robert Molaro is called to testify by defendants, plaintiffs may introduce evidence of defendants' contributions to his campaign, but solely for the purpose of showing his bias. If this occurs, defendants will be entitled to a limiting instruction if they request one.

Finally, it is unclear whether defendants seek to preclude evidence about their retention of Alonzo Monk, Blagojevich's former chief of staff, to lobby the governor on their behalf. This occurred, it appears, in 2007. Defendants do not reference this evidence in their motion *in limine*. Even though this evidently took place in 2007, it is unquestionably relevant and admissible: during his tenure as a lobbyist for the defendants, Monk had several conversations with Blagojevich regarding the 2008 Act.

**2. Evidence relating to the *US v. Blagojevich* criminal case**

Defendants ask the Court to exclude evidence that was admitted in Blagojevich's criminal case, including the charging documents and the judgment of conviction; the plea agreement and judgment of conviction of Alonzo Monk, who will be called by plaintiffs to testify in the present case; the grant of immunity to Johnston; and various recorded conversations and transcripts of those conversations. The Court ruled on these matters orally at the final pretrial conference on November 25 and simply summarizes those rulings here.

Plaintiffs have represented that during his deposition, Monk attested to the accuracy of the recordings and transcripts in question, so it is likely that he will do so at trial (and if he balks, his deposition testimony will be admissible for its truth under Federal Rule of Evidence 801(d)(1)(A)). Defendants object that the conversations are hearsay. They are not. First, there is sufficient evidence to support a finding that Monk, a paid lobbyist for defendants, was acting as their agent during the conversations in question, making his statements admissible against defendants pursuant to Federal Rule of Evidence 801(d)(2)(D) and the statements of the conversations' other

participants admissible to put Monk's statements in context.[2]  Second, and more

importantly, plaintiffs have laid the foundation for admissibility of the conversations in

their entirety as co-conspirator declarations under Rule 801(d)(2)(E).  The recorded

conversations may be considered in determining whether the basis for admissibility

under this Rule has been shown, *see Bourjaily v. United States*, 483 U.S. 171, 176–81

(1987), and there is enough evidence in addition to the recorded conversations

themselves to show the existence of a conspiracy and defendants' participation in it, *see

United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009).  This includes, among

other things, Johnston's own statements and other evidence cited by the Seventh

Circuit in upholding plaintiffs' claim relating to the 2008 Act.  *See Empress Casino Joliet

Corp.*, 763 F.3d at 726, 731-32.

The criminal complaint and indictment charging Blagojevich are inadmissible.

Plaintiffs want to introduce them to rebut defendants' assertion that they were, at most,

victims of a shakedown, not members of a bribery conspiracy.  Used for this purpose,

the charging documents are inadmissible hearsay.  The same is true of the judgment of

conviction.  (Defendants likewise may not attempt to draw from the criminal charges or

judgment against Blagojevich, or from contentions made by the government in the

criminal case against him, that they were victims and not willing participants.)

The Court also excludes Monk's plea agreement—identified as an exhibit by

plaintiffs—on the basis that the vast majority of its terms are irrelevant and would tend

---

[2]  If this were the sole basis for admission of the conversations, a limiting instruction
regarding the statements of participants other than Monk might be required.  *See United
States v. Wright*, 722 F.3d 1064, 1068 (7th Cir. 2013).  No such limiting instruction is
necessary or appropriate, however, because the conversations are also admissible
under Rule 801(d)(2)(E).

to confuse the jury in the present case.  As the Court stated at the pretrial conference, however, plaintiffs may elicit from Monk testimony that he pled guilty to conspiracy to solicit a bribe from defendants and also the outline of the facts to which he admitted. (Defense counsel stated at the pretrial conference that they did not object to testimony by Monk along these lines.  *See* Nov. 25, 2014 Tr. at 51-52.)  The plea agreement may be used if necessary to refresh Monk's recollection or to impeach him if he does not acknowledge what he agreed to, *see id.* at 52, but that will not make the agreement itself admissible as an exhibit.

Plaintiffs may introduce Johnston's immunity agreement, which he signed in December 2008 in connection with the Blagojevich investigation.  *See* Pls.' Resp. to Defs.' Mots. In Limine, Ex. 3.  The document includes a statement that Johnston's information may tend to incriminate him, which is relevant for fairly obvious reasons:  it is arguably an admission of the claims asserted in this case.  The related issue of the admissibility of Johnston's assertion of the Fifth Amendment is discussed in the next section.

**3.      Inference from invocation of Fifth
        Amendment by Blagojevich and Johnston**

The Court reaffirms its oral ruling at the final pretrial conference on November 25 that plaintiffs may not introduce evidence regarding Blagojevich's invocation of his Fifth Amendment privilege in connection with his deposition in the present case.  The only conceivable purpose for introducing the questions posed to Blagojevich and his invocation of the privilege is to draw an inference that truthful answers would have established the existence of a bribery conspiracy.  Plaintiffs have offered no basis to draw an inference adverse to defendants from Blagojevich's privilege claim.  And even if

this were somehow relevant, the grossly unfair prejudice to defendants would far outweigh the probative value of this evidence.

The Court also reaffirms its oral ruling that plaintiffs may introduce into evidence defendant Johnston's invocation—via his attorney—of the Fifth Amendment privilege during the Blagojevich investigation. Defendants' contention that Johnston never actually invoked the privilege does not pass the straight face test; that is the only way he could have obtained the grant of use immunity under which he testified at Blagojevich's criminal trials. Johnston's lawyer was acting as Johnston's agent when he advised federal prosecutors that Johnston would claim the privilege, and thus the invocation is properly admissible against Johnston. Defendants can, of course, introduce into evidence the fact that Johnston testified in Blagojevich's trials and also that he gave a deposition in this case without invoking the privilege. The Court leaves for later determination how the jury should be instructed regarding its consideration of Johnston's earlier invocation of the privilege.[3]

4.      **Newspaper articles**

Plaintiffs want to introduce news articles reporting statements by Blagojevich that were adverse to the interests of the horse racing industry. This evidence is relevant; it

_____

[3] In *Evans v. City of Chicago*, 513 F.3d 735 (7th Cir. 2008), a case not cited by either party, certain defendants invoked the Fifth Amendment privilege during discovery and then later agreed to testify. The trial judge allowed them to do so and also excluded evidence of their prior invocation of the privilege. The Seventh Circuit held that the latter ruling was not an abuse of discretion. This, of course, does not amount to a ruling that judge would have acted inappropriately in allowing evidence of the earlier privilege invocation. Indeed, the Seventh Circuit considered the admissibility of this evidence to be a "closer question." *Id.* at 746. The court also emphasized that its ruling turned on the standard of review: "the deferential (abuse of discretion) standard of review we must apply prohibits us from substituting our judgment for the judgment exercised" by the trial judge. *Id.* at 747.

tends to support the proposition that defendants needed to exert influence on Blagojevich to ensure his signature on the 2008 legislation. The problem with the evidence is twofold. First, if offered to show Blagojevich's adverse position, the articles are hearsay, and plaintiffs have offered no viable argument that any exception to the hearsay rule applies. Second, if offered to show the defendants' state of mind—that is, their awareness of Blagojevich's public position—based on the record as it now stands, plaintiffs are unable to lay the foundation regarding defendants' awareness of these articles. *See* Nov. 25, 2014 Tr. at 21-23. Thus the Court excludes the evidence, subject to reconsideration if plaintiffs are able to lay a proper foundation on that point. *See id.* at 23.

## Plaintiffs' motions *in limine*

**1.     Evidence regarding the 2008 Racing Act's passage (motion 3)**

Plaintiffs have moved to exclude evidence relating to the passage of the 2008 Act by the Illinois legislature.[4] Plaintiffs' claims in this case do not appear to include any contention that the alleged conspiracy to bribe Blagojevich involved procuring his assistance with legislative passage of the Act. Rather, plaintiffs' claims focus on obtaining Blagojevich's signature on the legislation.

Defendants want to introduce evidence that "both sides donated to the political candidates of their choice, both sides lobbied the legislature hard, and the 2008 Act only

---

[4] Evidence regarding the passage of the 2006 Act is irrelevant and inadmissible because, given the Seventh Circuit's ruling, plaintiffs cannot assert a claim regarding the passage and adoption of that Act. For reasons discussed earlier, the Court has authorized the admission, for a very narrow and focused purpose, of evidence regarding the length of time it took Blagojevich to sign the 2006 Act after the legislature adopted it. This does not open the door to admission of the circumstances of the legislature's adoption of the 2006 Act.

reached Blagojevich's desk after it passed the legislature."  Defs.' Resp. to Pls.' Mots. In Limine at 15.  Regarding the last of these points, it is obvious that evidence that the legislature adopted the 2008 Act is admissible; plaintiffs do not contend otherwise.

Given the focus of plaintiffs' claims on actions relating to the governor's signature, however, evidence regarding contributions to and lobbying of legislators and legislative candidates does not tend to make any fact at issue on plaintiffs' claims or defendants' defenses any more or less likely.  *See* Fed. R. Evid. 401.  And even if it is somehow relevant, evidence regarding what was done to get the Act passed by the legislature is marginally probative at best regarding the claim that defendants agreed to bribe Blagojevich to secure his signature on the 2008 Act.  The marginal probative value of this evidence is far outweighed by the amount of trial time that would be spent on issues involving legislative passage if evidence on that subject were admitted, and by the likelihood of confusion if the focus is turned to how the 2008 Act got through the legislature.  *See* Fed. R. Evid. 403.  For these reasons, the Court excludes evidence regarding the parties' contributions to legislators and their lobbying efforts focused on legislators.

Contrary to defendants' contention, the Court's decision to admit evidence regarding defendants' pre-2008 contributions to Blagojevich does not bring into play evidence regarding the process that led to passage of the 2008 Act.  Defendants say that such evidence, like the evidence regarding pre-2008 contributions to Blagojevich, "explains the Defendants' intent behind their actions in 2008."  *Id.*  But that is not what the Court concluded makes the pre-2008 contributions to Blagojevich admissible.  The Court has already delineated, earlier in this decision, the specific and narrow purpose

for which it has admitted that evidence.  *See supra* at 3.

Defendants also want to introduce evidence that Blagojevich never intended to veto the 2008 Act, irrespective of any contributions by the defendants; that the Act passed with broad legislative support; and that under Illinois law, the Act would have become law if it was not signed or vetoed within sixty days of its passage.  Plaintiffs do not appear to object to the first of these items, *see* Nov. 26, 2014 Tr. at 99, and the Court agrees with defendants that it is relevant.  The Court also agrees with defendants that evidence regarding the margin of passage of the Act by the legislature is relevant and admissible to show the absence of a motive to agree to bribe the governor—so long as defendants first lay the foundation by showing Johnston's awareness of the fact that the legislation had passed by a wide margin.  As defense counsel argued at the pretrial conference:  "It was probably the most popular bill passed in the session.  It was veto-proof.  There was no way Blagojevich was going to veto the bill.  Why would we agree to give him a hundred thousand dollars?"  *Id.* at 101.

In seeking to exclude this evidence, plaintiffs cite the Seventh Circuit's ruling on appeal regarding the 2008 Act.  Specifically, they rely on the following discussion in that court's decision:

> Blagojevich's signature on the bill caused the '08 Act to become law.
> Under Illinois law, bills passed by the General Assembly must be
> presented to the governor within 30 days. Ill. Const., art. IV, § 9(a).  "If the
> Governor approves the bill, he shall sign it and it shall become law." *Id.*
> "If the Governor does not approve the bill, he shall veto it by returning it
> with his objections to the house in which it originated." *Id.* § 9(b).  If the
> factfinder believes the evidence supporting the Casinos' allegations, it
> could conclude that the bill was presented to the governor and he signed it
> in exchange for a lucrative campaign contribution.  Unlike the allegation
> that the Racetracks bribed the governor to persuade the 150–member
> legislature to enact the bill, the '08 Act became law as a direct result of the
> alleged agreement to trade money for one person's action—the governor's

signature. A jury could find that the causal chain between the Racetracks' bribe and the governor's signing of the bill was not broken by any intervening acts of third parties. *Cf. Hemi Group*, 559 U.S. at 11 ("[T]he City's harm was directly caused by the customers, not Hemi."); *id.* at 25 (Breyer, J., dissenting) (taking issue with the majority's suggestion that "the intervening voluntary acts of third parties . . . cut[ ] the causal chain"). Only the governor had authority to sign the bill into law, and he did so.

It does not matter that the '08 Act passed the legislature by veto-proof majorities. *See* Ill. Const., art. IV, § 9(c). It cannot be assumed that a veto-proof majority will hold in the face of an executive veto. *See, e.g.*, McGrath, Rogowski, & Ryan, Gubernatorial Veto Powers and the Size of Legislative Coalitions (Dec. 11, 2013) (S. Pol. Sci. Ass'n), https://pages.wustl.edu/files/pages/imce/rogowski/mrrcoalitions-nov13.pdf (demonstrating how the threat of a veto affects legislative coalitions and influences policymaking); Steven Dennis & Emma Dumain, Roll Call, "The 39 House Democrats Who Defied Obama's Veto Threat," (Nov. 15, 2013), http://blogs.rollcall.com/218/the-39-house-democrats-who-defiedobamas-veto-threat/ (last visited August 15, 2014). Many legislators, especially those in the governor's party, may hesitate to override a veto even if they originally voted for the bill. That the '08 Act cleared the General Assembly by a veto-proof majority does not erase the significance of the governor's signature. If it did, it would be unnecessary to obtain the governor's signature on a bill that passed by veto-proof majorities.

Nor does it matter that the bill would have become law even if Governor Blagojevich had neither signed nor vetoed it. *See* Ill. Const., art. IV, § 9(b) ("Any bill not so returned by the Governor within 60 calendar days after it is presented to him shall become law."). RICO claims sound in tort. *See Beck v. Prupis*, 529 U.S. 494, 501–06 (2000) (discussing historical relationship between tort and RICO claims and explaining that "Congress meant to incorporate common-law principles when it adopted RICO"); *Anza*, 547 U.S. at 466–67 (Thomas, J., concurring in part and dissenting in part) (applying causation and damages principles from Restatement (Second) of Torts (1977) to analysis of RICO claims). The alleged bribery here was an intentional tort. Like an arsonist who burns down a cabin the day before a natural forest fire, the Racetracks may be "jointly and severally liable for any indivisible injury legally caused by [their] tortious conduct," regardless of innocent alternative causes. *See* Restatement (Third) of Torts: Apportionment Liability § 12 (2000).

*Empress Casino Joliet Corp.*, 763 F.3d at 732-33.

The Court reads this passage in the Seventh Circuit's decision as a

determination that on the issue of causation, the existence of a purported "veto-proof

majority" and the fact that the bill would have become law if Blagojevich had done nothing for 60 days are essentially beside the point, in light of governing principles of tort causation.  This is made clear by the court's unequivocal statement that "innocent alternative causes" do not affect the liability of an intentional tortfeasor.  That does not mean, however, that evidence regarding the margin of passage of the 2008 Act is irrelevant for all purposes.  The Seventh Circuit was not called upon to consider the theory of relevance articulated by defense counsel at the final pretrial conference.

As indicated earlier, the Court concludes that the evidence regarding the margin of passage is relevant and admissible.  Plaintiffs will, however, be entitled to a limiting instruction regarding the purpose for which this evidence is being admitted as well as an instruction at an appropriate time regarding its non-effect on the issue of causation.

The Court reserves judgment regarding the admissibility of evidence about what happens under Illinois law if the governor fails to sign or veto an enacted bill within sixty days.  Given their motive theory of relevance, defendants will need to make an offer of proof regarding their awareness of this legal rule.  If defendants can lay the appropriate foundation, this evidence will be admissible on the same basis and with the same limitations as the margin-of-passage evidence.

**2.      Evidence that the casinos proposed the 3% tax
        contained in the 2006 and 2008 Act (motion 8)**

Defendants wish to introduce evidence that the proposal for a 3% tax came from the casinos.  It appears that when the proposed legislation that led to the 2006 Act was being considered, there was a meeting or meetings that included representatives of both the casino and horse racing industries (and perhaps legislators).  According to defendants, "various ideas were bandied about to try to find agreement on a

comprehensive gaming bill," and the idea of a 3% tax evidently was first brought up by representatives of the casinos. *See* Nov. 26, 2014 Tr. at 79. This was offered, apparently, as an alternative to the horse racing tracks' proposal to permit slot machines at race tracks. *See id.* at 79-80.

This evidence is irrelevant with regard to the claims and defenses that remain in this lawsuit. Plaintiffs' remaining claims concern Blagojevich's signature on the Act passed by the legislature in 2008, not the process by which that Act—or, more specifically, its 2006 predecessor—was written. *See id.* at 83 (express disavowal by plaintiffs' counsel that plaintiffs' claims have anything to do with enlisting Blagojevich's assistance in connection with legislative passage). Evidence regarding the drafting process or what was done to enlist legislative support or get the bill through the legislative is therefore irrelevant. Put another way, this evidence does not make any fact legitimately at issue in this case more or less likely. Indeed, despite plaintiffs' argument in their motion that the evidence is irrelevant, *see* Pls.' Mots In Limine at 24, defendants' response addressed only the issue of the purported lack of corroboration of this evidence and made no argument regarding its relevance. *See* Defs.' Resp. to Pls.' Mots. In Limine at 25. Relevance aside, admission of this evidence would lead to a significant diversion of the trial onto a side track with essentially no probative value in return. The evidence is inadmissible as irrelevant and under Federal Rule of Evidence 403.

3. **Evidence regarding the Casinos' political contributions and lobbying (motion 2)**

Any competent evidence that defendants may have regarding lobbying or contributions by casinos directed at Governor Blagojevich is relevant and admissible.

But for the reasons discussed in the two previous sections of this ruling, evidence regarding plaintiffs' (or, for that matter, defendants') lobbying efforts and contributions directed at legislators is irrelevant. As indicated, plaintiffs no longer have a claim that defendants' alleged bribery conspiracy involving Blagojevich were aimed at influencing the activities of or vote by the state legislature.

Defendants' contention that evidence about plaintiffs' contributions to legislators "puts in context" defendants' contributions to the governor misses the point, as the Court indicated at the final pretrial conference on November 26. To be relevant, evidence must tend to make more or less likely some fact that "is of consequence in determining the action." Fed. R. Evid. 401. Defendants have identified nothing of the sort regarding plaintiffs' contributions to or lobbying of legislators. In particular, unlike plaintiffs—who have offered evidence supporting their *quid pro quo* claim involving the governor—defendants have offered no evidence of any improper arrangements vis-à-vis state legislators.

In any event, the "context" argument is specious. Again, the claims in this case involve the contention that defendants sought to procure the governor's signature on (or commitment to sign) the 2008 Act. Unless the law first passed the legislature, there would be no occasion for the governor to sign it. In other words, legislative passage of the Act and its signature by the governor are not parallel tracks in a system with separation of legislative and executive powers; the possibility of executive action does not even come into play until the legislative process is over and done with. For this reason, the contention that evidence of plaintiffs' claimed efforts to influence the actions

of the legislature somehow supplies context for evidence about influencing the actions of the executive *once the legislation was passed* does not hold water.

The Court also overrules defendants' contention that this evidence is somehow relevant to a defense of "unclean hands." First of all, the Court has determined that plaintiffs' unjust enrichment claim is a claim at law, not at equity. Unclean hands is an equitable defense and thus does not apply. But even if it did, defendants have offered no basis for a contention that the casinos' political contributions and lobbying efforts directed at legislators involved any sort of misconduct or improper activity, a requirement for a claim of unclean hands. *See, e.g., Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002); *Cunningham v. EquiCredit Corp. of Ill.*, 256 F. Supp. 2d 785, 797-98 (N.D. Ill. 2003).

**4.      Testimony by Professor Christopher Mooney (motion 1)**

Plaintiffs have moved to bar testimony by an expert witness offered by defendants, Dr. Christopher Mooney, a professor of political science at the University of Illinois. The general subject of Dr. Mooney's testimony is "whether the process that led to the passage and enactment of [the 2006 and 2008 Racing Acts], including the campaign contributions and lobbying efforts by Plaintiffs and Defendants, were consistent with the normal and legitimate political process resulting in the passage of legislation in Illinois." Defs.' Resp. in Opp. to Pls.' Mots. In Limine, Ex. B at 3 (Mooney report).

In his report, Dr. Mooney describes "the typical practice of lobbying and campaign contributing in Illinois state government and [ ] evaluate[s] whether the facts in the Case suggest behavior outside of normal and legitimate practices." *Id.* at 4. In

particular, he addresses the following topics:

- First, Dr. Mooney describes what lobbying involves and the general public's misconceptions about it. *See id.* at 4-5;

- He describes what "organized interests" (interest groups) are and how they go about advocating their interests vis-à-vis governmental action affecting them. Dr. Mooney reaches the conclusion that the general level of lobbying by both sides "in the legislative fight over the 2006 and 2008 Racing Acts [was] consistent with regular and legitimate practice." *See id.* at 6-7.

- Dr. Mooney identifies different types of lobbyists (corporate management; in-house lobbyists, and contract lobbyists) and how lobbyists of these various types were involved in lobbying in connection with the 2006 and 2008 Racing Acts. *See id.* at 7-9. Dr. Mooney includes a particularized discussion of two particular contract lobbyists, the aforementioned Alonzo Monk and John Wyma. Both were former Blagojevich chiefs of staff who, Dr. Mooney says, "were hired by the Defendants and the Plaintiffs, respectively, to lobby the governor on their behalf." *Id.* at 9. Dr. Mooney discusses at some length defendants' hiring of Monk and Monk's actions in lobbying Blagojevich on the 2008 Racing Act. He also discusses Wyma, quoting a blog post for information regarding Wyma and his activities. *See id.* at 10. Dr. Mooney concludes that "the types of lobbyists . . . employed by both sides in the legislative fight over [the 2006 and 2008 Racing Acts] were consistent with normal and legitimate practice." *Id.*

- Dr. Mooney also discusses lobbyist compensation, citing examples from California, Maryland, Florida, and Texas, as well as deposition testimony from a casino representative in this case about payments to lobbyists to monitor gambling legislation

in Illinois and deposition testimony from a former Illinois state legislator regarding his earnings as a lobbyist. Dr. Mooney also quotes the previously-mentioned blog post to the effect that Wyma "was reported to at one point be earning more than a million dollars as a lobbyist." *Id.* at 11 (internal quotation marks omitted). He also makes reference to publicly filed documents regarding compensation for lobbyists hired by race tracks. Taking all of this information, Dr. Mooney concludes that the amount of compensation paid to Monk by defendants to lobby on the 2008 Racing Act "was consistent with normal and legitimate practice." *Id.* at 12.

- Dr. Mooney addresses the types of activities engaged in by lobbyists, including monitoring governmental policymaking processes, providing information and analysis to governmental policymakers, meeting with them to communicate their clients' interests, and attempting to "translate" those interests into governmental policy, as well as dealing with legislators during their consideration of proposed laws, entering into coalitions with others who have common interests, and so on. *Id.* at 12-15. Dr. Mooney opines that "various lobbying activities employed by both sides in the legislative fight over [the 2006 and 2008 Racing Acts] were consistent with normal and legitimate practice." *Id.* at 15.

- Dr. Mooney also addresses the involvement of the governor in the legislative process itself, as well as the governor's options when a bill is adopted by the legislature, including signature, veto, or no action. Dr. Mooney describes the previously-discussed rule in Illinois that a bill passed by the legislature becomes law if the governor does not sign or veto it within sixty days. *See id.* at 15-16. He states that the governor's role in the process gives interested groups "a strong incentive to lobby the governor for their causes . . . ." *Id.* at 16. He goes on to discuss the ways in which lobbyists go about

lobbying governors and again states that both sides on the Racing Act hired a former Blagojevich chief of staff to lobby the governor. *See id.* at 16-17. Dr. Mooney concludes by stating that "the participating of the governor's office, and the lobbying of the governor by both sides, in the legislative fight over the 2006 and 2008 Racing Acts as described in the Case materials were consistent with normal and legitimate practice." *Id.* at 17.

- Dr. Mooney also discusses at length campaign contributions and their role in politics and policymaking. *See id.* at 17-19. He provides examples from California and Illinois regarding the overall amount of spending in gubernatorial elections. *See id.* at 19. Dr. Mooney also discusses, citing publicly filed materials, the amounts and quantity of larger contributions to the Blagojevich campaign and to Blagojevich's election opponents from 2002 through 2008. *See id.* at 20. He identifies particular contributors of large amounts—Fred Krehbiel and James Pritzker, who Dr. Mooney identifies (without a citation in support) as "a part owner of Plaintiff Grand Victoria Casino." *Id.* Dr. Mooney also notes that Illinois law does not impose restrictions on when during or before an election cycle contributions may be made, and he discusses (citing publicly available information) patterns of when candidates for governor receive contributions. *See id.* at 21. Dr. Mooney opines that "the contributions discussed in the Case materials appear to follow normal and legitimate practice." *Id.*

- Dr. Mooney continues by discussing why contributions to candidates for governor tend to be larger than those to candidates for the state legislature. He further notes that spending on the gubernatorial race increased significantly in 2006 as compared with 2002, and he offers factors to explain this. *See id.* at 21-22. Dr. Mooney

opines that "the campaign contribution activity of both sides in the Case were consistent with normal and legitimate practice." *Id.* at 22.

To be admissible, the testimony of an expert must, as a threshold matter, satisfy the criteria in Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (expert testimony "is admissible only if it is both relevant and reliable"). Plaintiffs argue that Dr. Mooney's testimony should be excluded, for several reasons: he draws legal conclusions; his analysis and conclusions are unreliable because he did not consider key facts; his methodology is unreliable; his analysis and conclusions will not assist the trier of fact; and he is not qualified to render his opinions. Plaintiffs also argue that the unfairly prejudicial effect of Dr. Mooney's testimony would substantially outweigh its probative value. *See* Fed. R. Evid. 403.

The Court's discussion of relevance issues earlier in this decision governs a good deal of the outcome of plaintiffs' motion *in limine* regarding Dr. Mooney. First, evidence regarding the adoption of the 2006 Racing Act is irrelevant and inadmissible, because

plaintiffs' claims, given the Seventh Circuit's ruling, do not concern the adoption of that Act.  Second, for the reasons discussed in the three preceding sections of this decision, evidence regarding contributions to and lobbying of legislators is likewise irrelevant and inadmissible.  (Even if somehow relevant, the marginal probative value of this evidence would be far outweighed by the significant waste of time and diversion of the jury's attention that would result from allowing Dr. Mooney's testimony regarding these issues.)  The same is true of Dr. Mooney's discussion of the governor's role in the legislative process—which is inadmissible for the same reasons—as distinguished from his role as the executive once legislation is passed.  On the latter point, the Court has determined that evidence regarding the previously-discussed 60 day rule is potentially admissible only on the issue of defendants' motive, and then only if defendants lay the necessary foundation as previously described.  *See supra* at 14.

On the other hand, testimony regarding interest groups and how they advocate their interests, and testimony regarding what lobbyists do is relevant, at least as a general matter.  The activities of defendants' lobbyist Alonzo Monk, as well as defendants' understanding regarding what Monk was doing, are at the core of the claims and defenses in this case.  Dr. Mooney notes that members of the general public often have misconceptions regarding the usual activities of lobbyists.  One appropriate function of an expert witness may be to debunk commonly held views.  *See, e.g., United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996).

The Court excludes, however, Dr. Mooney's opinions that the lobbying activity at issue in this case was consistent with regular, normal, and legitimate practice.  Dr. Mooney's deposition establishes that he did not take into account, or ignored, significant

evidence that contributes to plaintiffs' entitlement to a trial on their claims that defendants, at least partly acting through Monk, engaged in a scheme to bribe Blagojevich—in particular, the fact that Monk pled guilty to conspiracy to solicit a bribe and Johnston's invocation of the Fifth Amendment. These significant omissions make Dr. Mooney's testimony regarding the legitimacy of the lobbying activities in this case not "help[ful] [t]o the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Furthermore, Dr. Mooney's opinions regarding the "legitimacy" of lobbying efforts vis-à-vis the governor amount to opinions on an ultimate issue that the jury will have to decide. Though Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," such testimony still must be evaluated under Federal Rule of Evidence 403. Dr. Mooney's opinions on these points would be unduly confusing and unfairly prejudicial, in a way that significantly outweighs its probative value. The reasons include the just-mentioned failure to take into account key facts relating to the "legitimacy" of these activities, as well as the fact that the standard Dr. Mooney applies in these opinions— whether certain activities were "legitimate"—is rather vague and is at variance from what the finder of fact is called upon to decide.

Dr. Mooney may, within certain limitations, testify regarding compensation paid to lobbyists. Defendants offer no basis for a conclusion that the information regarding high-end lobbyist compensation that Dr. Mooney seems to have cherry-picked from states other than Illinois is at all relevant to whether Monk's compensation was within a normal range for Illinois lobbyists. In short, Dr. Mooney may rely in this regard only on information involving Illinois. In addition, the Court agrees with plaintiffs that Dr.

Mooney's reliance on a blog post regarding the activities of Wyma, what subjects he was lobbying on, and what his compensation might have been fails to satisfy the requirement that an expert premise his opinions only on facts or data upon which "experts in the particular field would reasonably rely . . . in forming an opinion on the subject." Fed. R. Evid. 703.[5] Dr. Mooney may not communicate to the jury the information garnered from the blog post. (This does not preclude defendants from offering other evidence on these points so long as it is otherwise admissible.) In addition, based on evidence cited by plaintiffs regarding Peter Liguori of Hyatt Gaming, *see* Pls.' Mem. in Support of Mots. in Limine at 5-6, a point to which defendants made no response and thus effectively conceded, Mr. Mooney may not communicate to the jury his contention, unsupported by any citation in his report, that Liguori engaged in lobbying regarding the Racing Act.

Dr. Mooney also may appropriately testify regarding the amounts of overall and particular contributions to candidates for governor in Illinois, to the extent the testimony is based on publicly filed and thus reasonably reliable data.[6] Plaintiffs are offering evidence regarding Johnston's contributions to Blagojevich and the allegedly promised contribution that is directly at issue in the case. Dr. Mooney's testimony regarding the

---

[5] Even if the blog post satisfied these criteria, the Court would preclude Dr. Mooney from communicating its contents to the jury via defendants' examination of him. The post is otherwise inadmissible hearsay. Although experts may under appropriate circumstances rely on such information, "the proponent of the opinion may disclose [it] to the jury only if [its] probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect," Fed. R. Evid. 703, which defendants have failed to show here.

[6] Evidence about contributions in other states is irrelevant, or at best only marginally relevant and unduly confusing and prejudicial, *see* Fed. R. Evid. 403, as discussed in the context of lobbyist compensation.

overall level of reported contributions and the amounts of larger reported contributions is relevant to rebut the implicit inference that Johnston's contributions and promised contributions were outside the norm.  In this regard, Dr. Mooney may testify to just that—the amounts of Johnston's contributions and purportedly promised contributions were well within the reported range of contributions to Illinois governors and gubernatorial candidates generally and to Blagojevich in particular.  He may not testify, however, that Johnston's purportedly promised $100,000 contribution was "legitimate." That encompasses a key issue the jury will have to decide, and the jury's consideration must be based on the full range of evidence admitted in the case, not the subset that Dr. Mooney took into account.  For this reason, his opinion regarding "legitimacy" would have limited probative value significantly outweighed by its potential for confusion.

Plaintiffs also take issue with Dr. Mooney's reliance on a contribution by James Pritzker, who he identifies, without a supporting citation, as a part owner of the Grand Victoria Casino.  Absent some reliable foundation for this—a showing defendants will be required to make in advance of Dr. Mooney's testimony and outside the jury's presence—the Court precludes Dr. Mooney from communicating this information to the jury.  *See* Fed. R. Evid. 703.

Finally, to the extent the Court has concluded that Dr. Mooney may appropriately testify, the Court overrules plaintiffs' objections to his qualifications and methodology. The record reflects that, with the limitations discussed above, Dr. Mooney has sufficient specialized knowledge and expertise in the field in question and that he has employed reliable methods in reaching his conclusions.

**5.** **"Unjust enrichment affirmative defense"; exhibits regarding "benefits retained" by defendants due to 2008 Act (motions 4 & 5)**

Defendants' motions *in limine* 4 and 5 concern overlapping points; both involve the proper measure of damages on plaintiffs' unjust enrichment claim. In motion 4, Plaintiffs contend that their recoverable damages on that claim consist of the amount the defendants received. For this reason, they ask the Court to exclude evidence of how the proceeds of the casino tax were used. Defendants contend that plaintiffs' damages for unjust enrichment consist of whatever amounts defendants retained. Thus they want to put into evidence how the proceeds were allocated. The Court has reviewed the supplemental authorities offered by the parties at the Court's invitation, but it is not in a position to adjudicate the dispute without further argument. Counsel should be prepared to present arguments on this issue on Monday, December 1 at 9:45 a.m.

Plaintiffs' motion *in limine* 5 concerns defendants' exhibits 34 and 35. These exhibits show how the proceeds of the 2008 Act were allocated and spent. Defendants contend these exhibits are relevant on the claim of unjust enrichment, for the reasons just discussed.

Even if defendants end up prevailing on the measure-of-damages issue, the information contained on the bottom half of exhibit 34 (document number BM-002431) does not appear to the Court to be relevant. The Racing Act evidently required a set-aside of sixty percent of the proceeds of the casino tax for a fund for horsemen. The remaining forty percent was to be used for track expenses. Defendants essentially contend that they received *no* benefit (and thus plaintiffs are entitled to no damages on the unjust enrichment claim), because all of the money was spent, and required to be spent, for the purposes just mentioned. The bottom half of exhibit 34 shows the

breakdown of the forty percent of the tax proceeds that were used for track-related expenses. The Court does not see how defendants possibly could be entitled to exclude this portion of the proceeds from any calculation of the benefits defendants retained as a result of their allegedly wrongful conduct. Money is money. If defendants were able to use the casino tax proceeds to defray track expenses, that freed up other revenues to be used for other purposes, including a return of profits to the tracks' owners. For this reason, whatever the proper measure of damages for unjust enrichment turns out to be, the Court sees no legitimate basis to allow into evidence the specifics of exactly how the forty percent was spent; it does not appear to be relevant in the least.

With regard to exhibit 35 (document number BM-002432), the Court will need further explanation of the information described on this exhibit before it can rule on the exhibit's admissibility. The document's import is not self-evident, and the Court is, frankly, unable to figure it out.

Plaintiffs have also made a late disclosure argument regarding exhibits 34 and 35. Plaintiffs first asserted their unjust enrichment claim only recently, and defendants disclosed the exhibits—which they say they are offering only on that particular claim— promptly after plaintiffs were given leave to add the claim. As the Court stated at the final pretrial conference on November 26, the timing of this disclosure is part of the price plaintiffs pay for their rather late addition of the unjust enrichment claim.

Plaintiffs also object that the documents are summaries admissible, if at all, only under Federal Rule of Evidence 1006, and that they have not been provided the underlying documents from which the accuracy of the summaries can be ascertained.

Defendants represent that exhibit 35 is not a litigation-generated summary but instead was created in the ordinary course of defendants' business. The Court takes defense counsel at their word and thus concludes that non-disclosure of underlying information does not warrant exclusion of this exhibit. Defendants also represent that they disclosed the documents or information underlying exhibit 34—which *is* a litigation-generated summary—roughly contemporaneously with their disclosure of the exhibit itself. Again, the Court takes defense counsel at their word on this. If plaintiffs require further information regarding the specifics of exhibit 34, the Court will permit them to take a 30 minute deposition of the witness through whom defendants propose to introduce the exhibit, to be taken outside of trial time on some date before the date of the witness's anticipated testimony.

**6.      Letter from prosecutors soliciting a victim
          impact statement from Johnston (motion 6)**

The Court excludes evidence regarding the U.S. Attorney's Office solicitation of a "victim impact" letter from Johnston via his counsel. The only conceivable purpose for this is to show that the government viewed Johnston as a victim. Indeed, defendants quite candidly concede that is why they want the letter and similar evidence introduced. *See* Nov. 26, 2014 Tr. at 84-85. The government's view on this subject is irrelevant; defendants have offered no viable argument to the contrary. The Court also notes that the letter's express or implicit characterization of Johnston as a victim is inadmissible hearsay.

**7.      Prior lawsuits regarding the casino tax legislation (motion 7)**

Evidence relating to prior state court litigation in which plaintiffs challenged the constitutionality of the Racing Act is irrelevant, and the Court excludes it. Defendants

say that evidence of the state supreme court's ruling upholding the act "rebuts the insinuation that the law itself is somehow wrongful," Defs.' Resp. to Pls.' Mots. In Limine at 23, but that is a straw man, as plaintiffs are not asserting such a claim in this case. Admission of this evidence would also lead to a far-flung detour from those matters that are relevant to the claims and defenses in this case. *See* Fed. R. Evid. 403. Defendants also contend that the prior lawsuits "help show bad faith and improper motive in bringing litigation," *id.* at 24, but that is not a legitimate issue for consideration by the Court or jury.

## Conclusion

The parties' motions *in limine* are ruled upon in accordance with this decision. Counsel are expected to carefully inform their witnesses regarding the Court's rulings, so as to avoid introduction of evidence that the Court has excluded.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  November 28, 2014