**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EMPRESS CASINO JOLIET CORP.,**<br>**et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **No. 09 C 3585** |
| | ) | |
| **JOHN JOHNSTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Several Illinois casinos sued John Johnston and entities that own two horse racing tracks, alleging that the defendants conspired with former Illinois Governor Rod Blagojevich to pay him money in exchange for his signature on the 2008 Illinois Horse Racing Act. The legislation taxed the casinos three percent of their adjusted gross revenues, and the proceeds were placed in a trust for the benefit of the Illinois horse racing industry.

The case was tried before a jury, which found in favor of the plaintiffs on three counts: conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(d), 1964, civil conspiracy under Illinois law, and unjust enrichment. The jury awarded the casinos roughly $26 million in compensatory damages, which was trebled under RICO, *id.* § 1964(c), along with $4 million in punitive damages for the civil conspiracy claim. Defendants have moved for judgment as a matter of law and for a new trial. The Court denies the motion for the reasons stated

below.

**Discussion**

**A.     Motion for judgment as a matter of law**

Judgment as a matter of law under Federal Rule of Civil Procedure 50 is appropriate only if "no rational jury could have found for the defendants." *Venson v. Altamirano*, 749 F.3d 641, 646 (7th Cir. 2014).  When reviewing a motion for judgment as a matter of law, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**1.     Quid pro quo**

Defendants argue that there was insufficient evidence for the jury to find a quid pro quo, as is required for each of plaintiffs' claims.  Because the jury heard evidence from which it could reasonably find a quid pro quo, defendants are not entitled to relief.

Alonzo Monk was a former chief of staff to Blagojevich who Johnston hired as a lobbyist.  Monk acted as the intermediary between Blagojevich and Johnston and was at the center of the bribery allegations in this case.  In recorded conversations, Blagojevich pressed Monk about when Johnston would make a contribution.  Johnston told Monk that he was concerned about the money the race tracks were losing each day Blagojevich did not sign the bill, and Monk conveyed this information to Blagojevich.

Monk testified that the only time Blagojevich's signature was expressly tied to a contribution was during a conversation between Monk and Johnston on December 3, 2008.  12/3/2014 Tr. at 462–63.  He also testified that Johnston did not agree to contribute $100,000 in exchange for Blagojevich's signature on the 2008 Act.  But an

express agreement is not required for civil conspiracy or conspiracy under 18 U.S.C.

§ 1962(d).  *See Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988).  Plaintiffs

presented evidence from before and after December 3, 2008 from which the jury could

conclude that there was a tacit agreement for Johnston to give a contribution in

exchange for Blagojevich's signature.

Addressing the evidence chronologically, Johnston testified that he met with

Blagojevich and discussed the 2008 Act in April 2008.  At that meeting Blagojevich said,

"I've appreciated your support in the past and I look forward to your support in the

future."  12/4/2014 Tr. at 709–10.  This evidence that Johnston's contribution and the

2008 Act were discussed at the same meeting months before the bill was signed, when

considered with the other evidence, could have led a reasonable jury to conclude that

the two were linked from the outset.  According to Monk, Blagojevich said that he had

secured a $100,000 commitment from Johnston in August or September 2008.

12/2/2014 Tr. at 304–05.  Shortly after that, Johnston's name was listed on a Friends of

Blagojevich fundraising list.  *Id.* at 305–06; Pls.' Ex. 14.  In a telephone conversation

that was recorded by government agents in November 2008, Monk told Robert

Blagojevich (the governor's brother) that Johnston was "good for it," referring to the

promised contribution.  12/2/2014 Tr. at 322.  Additionally, the jury reasonably could

have concluded that Johnston's e-mail to members of the horse racing industry dated

November 24, 2008 discussing the Act and stating, "[w]e are going to have to put a

stronger bit in his mouth," was evidence of Johnston's intent to improperly influence

Blagojevich.  Pls.' Ex. 27; 12/3/2014 Tr. at 541.  Based on this evidence, the jury

reasonably could have concluded that Johnston tacitly agreed to pay $100,000 in

exchange for Blagojevich's signature sometime during the fall of 2008.

Additionally, the jury reasonably could have believed Monk's testimony about his meeting with Johnston at Maywood Park on December 3, 2008.  Both Monk and Johnston testified that during that meeting, Monk told Johnston that the governor would not sign the 2008 Act without a campaign contribution.  Although Johnston testified that he was disgusted and did not plan to contribute, the jury could have believed Monk, who said that even though Johnston did not make a "specific promise," Monk "thought [Johnston] was going to make a donation as a result of the meeting and other discussions I had."  12/2/2014 Tr. at 360.  Immediately after that meeting, Monk called Blagojevich to report that Johnston would pay the money within two weeks.  Pls.' Ex. 36. This testimony supports plaintiffs' contention that Johnston tacitly agreed to pay a contribution in exchange for Blagojevich's signature.

**2.      Pattern of racketeering activity**

Defendants argue that there was insufficient evidence that RICO's pattern requirement was met.  To establish civil liability for conspiracy under RICO, plaintiffs had to prove that defendants agreed that the affairs of the enterprise would be conducted through "a pattern of racketeering activity," which is defined as "at least two acts of racketeering activity."  18 U.S.C. §§ 1961(5), 1962; *see also Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir. 2000).  Although a plaintiff is required to establish two predicate acts, such a showing is not necessarily sufficient. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989).  The predicate acts must be related and must "amount to or pose a threat of continued criminal activity."  *Id.* at 239.

The Court concluded in its October 24, 2014 summary judgment ruling that plaintiffs identified multiple predicate acts that a reasonable jury could conclude constituted RICO predicates, including "the agreement to pay the bribe itself as well as multiple acts of alleged wire fraud (if nothing else, telephone calls involving the anticipated bribe)." 10/24/2014 Order at 9.  Plaintiffs offered evidence of these acts at trial.  Defendants argue that because December 3, 2008 was the first time a quid pro quo was discussed, they could not have agreed to the commission of predicate acts that took place before that date.  But at least one phone call was recorded *after* the December 3 meeting, which the jury could reasonably conclude constituted a RICO predicate.  Pls.' Ex. 36.  Moreover, there was evidence from which the jury could have found an implicit agreement before December 3, as the Court has discussed.

Defendants also argue that "multiple manifestations of the same predicate act" cannot constitute a pattern.  Defs.' Mem. in Supp. of Renewed Mot. for J. as a Matter of Law at 5.  They essentially contend that there was no threat of continued criminal activity because this case involves a single alleged bribe.  A plaintiff can establish continuity through a closed- or open-ended scheme.  Specifically, a plaintiff "may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time" or may demonstrate open-ended continuity where "the threat of continuity is demonstrated."  *H.J. Inc.*, 492 U.S. at 242.  Here, there is insufficient evidence of a closed scheme, because the conspiracy lasted at most from April to December of 2008.  (Although Johnston made a contribution in 2007, there was no evidence that this was improper.)  *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) ("The cases in our circuit . . . demonstrate that a time

frame of less than nine months likely does not satisfy the duration requirement.").

Nonetheless, the jury reasonably could have found open-ended continuity. Open-ended continuity "exists when the plaintiff can show (1) a 'specific threat of repetition,' (2) that the 'predicate acts or offenses are part of an ongoing entity's regular way of doing business,' or (3) that the defendant operates a 'long-term association that exists for criminal purposes.'" *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992) (quoting *H.J., Inc.* 492 U.S. at 242–43). The Seventh Circuit has found that a scheme to perpetrate a single episode of fraud or theft involving one victim does not constitute a pattern of racketeering activity in certain circumstances, even if multiple acts of mail or wire fraud can be shown.[1] The Seventh Circuit, in an attempt to reconcile those cases with single-victim cases in which a pattern was found, has instructed courts to apply a commonsense approach and consider several factors in determining the existence of a pattern: the number and variety of predicate acts, the

---

[1] *See, e.g., Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990) (finding no pattern of racketeering when the allegedly fraudulent scheme "had a natural ending with no threat of continued criminal activity" and was to be short-lived, and there was "no evidence that, had the scheme worked, it would have been repeated in the future"); *Mgmt. Comp. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 51 (7th Cir. 1989) (declining to find a pattern of racketeering in "a contract dispute involving one 'victim,' one transaction between the parties, and, at most two predicate acts" and concluding that defendant's "subsequent use of the allegedly stolen software [after the theft] cannot be characterized as subsequent thefts"); *Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 323–24 (7th Cir. 1986) (concluding that "misrepresentations [that] amounted to at least twelve separate acts of mail fraud" associated with the purchase of a company and its subsidiary did not constitute a pattern of racketeering where the acts were "designed to defraud one victim [ ] on one occasion"); *see also Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir. 1992) (declining to find a pattern of racketeering activity in a case that "involve[d] several instances of criminal behavior—a bribe, several false statements, a cover-up, and (possibly unlawful) access to confidential information," because the actions "took place over a comparatively short period of time" and "comprise[d] a single effort to obtain (and to keep) one $96 million Defense Department contract").

length of time over which they were committed, the number of victims, and the occurrence of distinct injuries. *See, e.g., Mgmt. Comp. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 50–51 (7th Cir. 1989); *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 524 (7th Cir. 1995). No particular factor is necessary or dispositive. *See Uniroyal Goodrich Tire Co.*, 63 F.3d at 524. In *Uniroyal Goodrich Tire Co.*, the court concluded that a pattern had been alleged, because "the various predicates of mail and wire fraud occurred repeatedly over a period as long as three years and each scheme, though inflicted upon the same victim, caused separate and distinct injuries." *Id.* In another decision, the Seventh Circuit observed that "the ongoing bribes of two public officials, even if pertinent only to a single ongoing service contract, may well establish a 'pattern.'" *United States v. Horak*, 833 F.2d 1235, 1240 (7th Cir. 1987).

This case involves the solicitation of one bribe, because this Court and the Seventh Circuit agreed that there was no evidence that a bribery scheme caused the passage of the 2006 Act, the predecessor of the 2008 Act that expired in May of 2008. *See Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 729–31 (7th Cir. 2014). Nonetheless, plaintiffs presented enough evidence at trial that the jury reasonably could have found separate and distinct injuries and a threat of repetition. Evidence was presented that the 2008 Act included a sunset provision, and Johnston and other members of the horse racing industry considered what would happen when the Act expired in 2011. 12/3/2014 Tr. at 519, 532; Pls.' Ex. 15. Based on this testimony, along with the testimony that Blagojevich regularly traded state action for campaign contributions, the jury could have concluded that there was a reasonable likelihood that

Johnston might again agree to bribe the governor in 2011—in other words, that there was a threat of continued criminal activity. Moreover, the alleged bribery scheme involved separate and distinct injuries to the casinos, because they were required to make payments to a general fund on a daily basis under the statute. 12/2/2014 Tr. at 241. And finally, this case cannot be described as one involving a single victim, like a traditional fraud or theft case. Although the casinos were the direct victims of the conspiracy, the scheme also deprived the public of its right to honest services of a public official. *See* 12/8/2014 Tr. at 1090–91 (jury instructions on the elements of honest services wire fraud). In sum, there is sufficient evidence from which a jury could reasonably have found a pattern of racketeering activity.

## B.    Motion for new trial

Under Federal Rule of Civil Procedure 59, a court may grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006). With respect to challenged evidentiary rulings, the district court has "broad latitude to control the admission of evidence." *United States v. Calabrese*, 572 F.3d 362, 368 (7th Cir. 2009). "[I]n order to obtain a new trial based on an incorrect jury instruction, [a plaintiff] must establish both that the instructions failed to properly state the law and that he was prejudiced by the error because the jury was likely to be misled or confused." *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 609 (7th Cir. 2013). Even if the Court erred in making an evidentiary ruling or giving a jury instruction, defendants must show that the error affected their substantial rights in order to be entitled to a new trial. Fed. R. Civ. P. 61;

*Smith v. Chesapeake & Ohio Ry. Co.*, 778 F.2d 384, 389 (7th Cir. 1985).

### 1. Adverse inference instruction

Defendants claim that the Court erred in instructing the jury that it could draw an adverse inference against Johnston because he invoked the Fifth Amendment privilege during the criminal investigation of Blagojevich in 2008. They claim that the instruction was inappropriate because Johnston never refused to testify or answer questions about his interactions with Blagojevich or Monk.

The instruction was appropriate. A court may issue an adverse inference instruction at its discretion when the Fifth Amendment privilege is claimed by a party in a civil case. *See Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993). In this case, the Seventh Circuit stated that a reasonable juror could find in favor of the casinos in part based on the fact that "Johnston signed an immunity agreement in which he acknowledged that he had information that 'may tend to incriminate' him." *Empress Casino Joliet Corp.*, 763 F.3d at 732. The Court did not err in giving an adverse inference instruction, which specified that the jury could, but was not required to, infer that Johnston had incriminating information. 12/8/2014 Tr. at 1084 ("In a civil case like this one, you may infer that Mr. Johnston had information that would have incriminated him. You are not required to draw this inference.").

Moreover, defense counsel argued during closing that any inference one could draw from Johnston's invocation of the Fifth Amendment privilege was mitigated by his later truthful testimony. *Id.* at 1158–60. The jury considered the very argument defendants now present to the Court as a basis for a new trial. Thus, any claimed error was harmless.

9

Defendants also argue that the Court erred in admitting Johnston's 2008 immunity agreement with the Department of Justice and excluding a letter Johnston's attorney received from the U.S. Attorney's Office in 2011 soliciting a victim impact statement. The Court concluded before trial that Johnston's immunity agreement was "relevant for fairly obvious reasons: it is arguably an admission of the claims asserted in this case." *Empress Casino Joliet Corp. v. Johnston*, No. 09 C 3585, 2014 WL 6735529, at *4 (N.D. Ill. Nov. 28, 2014). The Court did not err in admitting this evidence.

The Court excluded the victim impact statement because the government's view about whether Johnston was a victim was irrelevant and because the characterization of Johnston as a victim was inadmissible hearsay. *Id.* at *13. Defendants now argue that "[t]he victim letter was not hearsay, since it was not offered for the truth of the matters asserted in the letter but rather to explain Johnston's belief that he was a victim of Blagojevich's extortion scheme, and also to substantiate that the DOJ shared that belief." Defs.' Mem. in Supp. of Renewed Mot. for J. as a Matter of Law at 8. But a letter written by the government in 2011 is not relevant to prove Johnston's state of mind in 2008. And contrary to defendants' suggestion, the letter, if offered to prove that the government viewed Johnston as a victim, is both hearsay and irrelevant. The Court did not err in excluding the letter.

## 2. Contributions between 2002 and 2007

Defendants argue that a new trial is warranted because the Court erred in admitting evidence of campaign contributions totaling over $300,000 to Friends of Blagojevich between 2002 and 2007.

The Court ruled before trial that those contributions were admissible as background that "tends to support the notions that [Johnston] would have agreed to make a significant contribution in 2008 and that Blagojevich and his agents would have sought a significant contribution from Johnston at that time." *Empress Casino Joliet Corp.*, 2014 WL 6735529, at *2. The Court also observed that "[p]laintiffs' evidence indicates that Johnston had a regular business practice—to put it another way, a habit— of making significant contributions to Blagojevich during his campaigns for and service as governor." *Id.* Evidence was presented that Johnston made contributions ranging from $10,000 to $100,000 in May 2002, October 2002, July 2003, June 2004, June 2005, June 2006, and December 2007. Pls.' Ex. 49. Even though the amounts of the contributions differed, this evidence was admissible under Federal Rule of Evidence 406. Johnston had contributed for five years in a row, and those yearly contributions were sufficiently routine and consistent for the Court to conclude that this evidence tended to make it more probable than not that Blagojevich would ask for a contribution again in 2008. *See Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994). Additionally, the evidence was relevant to explain Johnston's statement, as quoted by Monk on one of the recorded calls, that "I've got a history of giving these amounts to him so I'm not worried . . . ." Pls.' Ex. 17.

The Court properly precluded plaintiffs from suggesting that "any of the prior contributions involved a quid pro quo." *Empress Casino Joliet Corp.*, 2014 WL 6735529, at *2. The Court also properly limited the purposes for which the jury could consider the past contributions by giving the following instruction:

> It is common for citizens and corporations to donate to political campaigns, and there is nothing illegal about this practice. I have

admitted this evidence only for the following purposes: A, to show that defendants had a regular practice of making significant contributions to Rob Blagojevich's campaigns during his campaigns for and service as governor; and, B, as support for the proposition that Blagojevich would have sought a significant contribution from Johnston in 2008. You may not consider this evidence for any other purpose.

12/8/2014 Tr. at 1084. Defendants argue that the jury should have been expressly instructed that Johnston's early contributions were lawful. But the statement that the jury "may not consider this evidence for any other purpose" was sufficient to prevent the jury from concluding that the earlier contributions were unlawful.

Defendants also argue that plaintiffs violated the Court's ruling by suggesting that the contributions between 2002 through 2007 were unlawful. Plaintiffs elicited testimony that Johnston had not made a contribution of more than $2,500 to any governor before Blagojevich and that his contributions to Blagojevich were almost fifty times more than he had given any other governor. 12/4/2014 Tr. at 705–06, 764. This was not improper, as the Court had ruled that plaintiffs could elicit this testimony after Johnston opened the door by downplaying his contributions to Blagojevich. *Id.* at 678–80.

Defendants also argue that plaintiffs' counsel inappropriately suggested that defendants used outside companies controlled by Johnston to contribute to Friends of Blagojevich. *Id.* at 781–86. The Court disagrees. It was appropriate for plaintiffs to elicit testimony about the entities through which Johnston made contributions.

Defendants also point to plaintiffs' closing argument, during which counsel said:

We get to the end of 2007, and $25,000 goes to Friends of Blagojevich, $25,000 when they say they knew that Blagojevich wasn't running for election. There was no campaign event that was happening in December of 2007. He says: Rod Blagojevich never asked me for any money. They just gave him $25,000, even though they say at that point, they decided

> not to support him anymore; and even though Mr. Johnston had to admit, other than Mr. Blagojevich, who they gave $320,000 to over five and a half years, Mr. Johnston and his companies had never given any Illinois governor, election year or not, more than $2,500. And now in December of 2007, they're giving ten times that much to Rod Blagojevich and more than they had ever given him in any nonelection year.

12/8/2014 Tr. at 1107–08. It was appropriate for plaintiffs' counsel to point out that defendants supported Blagojevich even when there was no election pending and that those contributions were significant. Plaintiffs' attorney accurately summarized the evidence and did not suggest that the 2002 to 2007 contributions were unlawful. Plaintiffs therefore did not violate the Court's rulings.

### 3. Chris Kelly

Defendants argue that the Court erred in allowing plaintiffs to introduce evidence about Chris Kelly, a confidante and fundraiser for Blagojevich who was also friends with Johnston. Johnston called Kelly to let him know that the race tracks had hired Monk as a lobbyist. Defendants did not respond to plaintiffs' arguments on this issue in their reply brief. In any event, evidence about Kelly was relevant and admissible.

Before trial, the Court ruled "that evidence of defendants' contacts with Kelly relating to the 2006 Act is [ ] inadmissible" because plaintiffs had not presented evidence that a bribery scheme led to the passage of the 2006 Act. *Empress Casino Joliet Corp.*, 2014 WL 6735529, at *1. During trial, however, the Court allowed plaintiffs to question Johnston about his interactions with Chris Kelly *after* 2006. The Court concluded that Johnston's communications with Kelly letting him know that the race tracks had hired Monk were "relevant to show what Mr. Johnston was aiming for when he hired Mr. Monk." 12/3/2014 Tr. at 504. Plaintiffs also elicited testimony about Kelly to show the existence of the Blagojevich enterprise. 12/2/2014 Tr. at 272–74, 276–77.

13

Defendants claim that evidence about Kelly prejudiced the defendants because it could have led the jury to find liability by association. But both defendants and plaintiffs emphasized that mere association is not enough for conspiracy during closing arguments, and the Court also provided an instruction to that effect. 12/8/2014 Tr. at 1090, 1163–64, 1174–75. Plaintiffs argued that Johnston called Kelly when he hired Monk "[t]o let the enterprise know, I got one of your guys on payroll. It is not just guilt by association. It's association with the guilt." *Id.* at 1175. The evidence concerning Chris Kelly was admissible and did not prejudice the defendants.

### 4. Defendants' damages theory

Defendants argue that they are entitled to a new trial because the Court precluded them from arguing that "the only damages Defendants caused—even if the jury accepted the Plaintiffs' bribery theory—were the additional taxes Plaintiffs paid as a result of Blagojevich signing the bill earlier than the deadline for his signature." Defs.' Mem. in Supp. of Renewed Mot. for J. as a Matter of Law at 13. During closing, defense counsel argued that Blagojevich would have signed the bill after it was voted through the legislature even if Johnston did not contribute. He remarked,

> On November 24th, the law got to the governor's desk. Every bit of evidence available, the governor was never going to veto this bill. The only issue was when he would sign it. Even if he didn't want to sign it, even though there was no language, it would become law January 23rd, '09. Yet the casinos want $67 million.

12/8/2014 Tr. at 1164. Plaintiffs' counsel objected, and the Court sustained the objection, stating that "[t]hat argument is contrary to an instruction that is on page 12." *See id.* at 1164–65. Defendants now argue that the Court's ruling was inappropriate and that they "should have been permitted to argue that the Casinos' damages are, at

most, measured by the $83,000 in taxes paid per day under the 2008 Racing Act

multiplied by 60 days (the maximum amount of time Blagojevich could have sat on the

bill without signing it), for a total of $4,980,000."  Defs.' Mem. in Supp. of Renewed Mot.

for J. as a Matter of Law at 13.[2]  But defendants did not present this argument to the

Court before closing arguments, and this damages theory did, in fact, contradict the jury

instruction on damages.

The Seventh Circuit ruled that because this was "an intentional tort," "the

Racetracks may be 'jointly and severally liable for any indivisible injury legally caused by

[their] tortious conduct,' regardless of innocent alternative causes."  *Empress Casino*

*Joliet Corp*, 763 F.3d at 733 (quoting Restatement (Third) of Torts: Apportionment

Liability § 12 (2000)).  In its ruling on motions in limine, this Court interpreted this part of

the opinion in the following way:

> The Court reads this passage in the Seventh Circuit's decision as a
> determination that on the issue of causation, the existence of a purported
> "veto-proof majority" and the fact that the bill would have become law if
> Blagojevich had done nothing for 60 days are essentially beside the point,
> in light of governing principles of tort causation.  This is made clear by the
> court's unequivocal statement that 'innocent alternative causes' do not
> affect the liability of an intentional tortfeasor. . . .  [T]he Court concludes
> that the evidence regarding the margin of passage is relevant and
> admissible.  Plaintiffs will, however, be entitled to a limiting instruction
> regarding the purpose for which this evidence is being admitted as well as
> an instruction at an appropriate time regarding its non-effect on the issue
> of causation.

*Empress Casino Joliet Corp.*, 2014 WL 6735529, at *7 (quoting *Empress Casino Joliet*

*Corp.*, 763 F.3d at 732–33).  Based on this understanding, the Court instructed, "The

defendants may be held liable for any injury proximately caused by the alleged

---

[2] The bill would have become law within sixty days absent any action by Blagojevich.
*See* Ill. Const., art. IV, § 9(b).

agreement to pay a bribe to Governor Blagojevich regardless of any events that could

have happened in the future." 12/8/2014 Tr. at 1087–88, 1093. The Court also

instructed that if the jury found in favor of plaintiffs, they should award compensatory

damages based on "the amount of money that will fairly compensate plaintiffs for any

loss to their business or property that you find was proximately caused by the

conspiracy to violate the RICO law." *Id.* at 1094. The Court defined proximate cause as

"a cause that, in the natural or ordinary course of events, caused damage to the plaintiff.

It need not be the only cause nor the last or nearest cause. It is sufficient if it combines

with another cause resulting in the injury." *Id.* at 1086. The proximate cause instruction

was appropriate for liability based on the Seventh Circuit's ruling.

Defendants now suggest for the first time that the Seventh Circuit's discussion of

proximate causation with respect to liability does not apply to the damage calculation.

But defendants did not present any argument on this point before or during trial. *See*

12/5/2014 Tr. 1037–40 (discussing jury instructions on causation with respect to

liability); Proposed Pretrial Order (dkt. no. 343) at 191–93, 207–10 (defendants'

objections to plaintiffs' proposed causation instructions). Defendants requested the

following instruction for damages:

> A plaintiff must prove that the defendant's conduct was a proximate cause
> of the plaintiff's damages. Conduct 'proximately causes' a loss if, in
> natural or probable sequence, it produces the particular loss that is
> claimed.

Proposed Pretrial Order (dkt. no. 343) at 208, 292. For liability, they asked that the

Court instruct that plaintiffs had to prove a direct relationship between defendants'

conduct and the casinos' injury. *See id.* at 193, 257. The Court rejected these

definitions of proximate cause as inappropriate in light of the Seventh Circuit's opinion.

16

The damages instruction was not disputed on the basis that defendants now raise. In the pre-trial order, defendants objected to plaintiffs' compensatory damages instruction because "it directs the jury as to what they can and cannot consider as damages." *Id.* at 207–10. But at no point did defendants suggest that even if the Court accepted the plaintiffs' proposed proximate cause definition as to liability, a different instruction was warranted for damages. Generally, by failing to specifically object or offer any argument in support of a position during trial, a defendant forfeits the argument. *See Davis v. Wessel*, No. 13-3416, 2015 WL 4095358, at *7 (7th Cir. July 7, 2015) (to preserve argument regarding a jury instruction, "[t]he objection must be specific enough that the nature of the error is brought into focus. . . . There are no formal requirements, but pragmatically speaking the district court must be made aware of the error prior to instructing the jury, so that the judge can fix the problem before the case goes to the jury." (internal quotation marks omitted)); *Petkus v. Richland Cty.*, 767 F.3d 647, 654 (7th Cir. 2014) ("Although [the county] submitted its own instructions, which the judge declined to give, it failed to object to the instructions that the judge did give. That was another forfeiture."). Under Rule 51(d)(2), the Court may review a jury instruction for plain error, even if an objection has not been preserved, if the instruction affected the party's substantial rights. Fed. R. Civ. P. 51(d)(2). Defendants have the "burden of establishing that the error affected substantial rights, i.e., that the outcome probably would have been different without the error." *Prod. Specialties Grp., Inc. v. Minsor Sys., Inc.*, 513 F.3d 695, 700 (7th Cir. 2008); *see also Young-Smith v. United Steelworkers of Am., AFL-CIO, CLC,* No. 14-3617, 2015 WL 3875475, at *3 (7th Cir. June 24, 2015).

In the proposed pretrial order, defendants did cite, though without argument or analysis, one case that supports their position that the causation analysis differs for liability and damages. *See* Proposed Pretrial Order (dkt. no. 343) at 293. In that case, the Seventh Circuit reversed summary judgment in favor of defendants on causation grounds, ruling that the plaintiffs had presented evidence that they suffered injury as a result of defendants' misconduct. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011). There was some question, however, about whether plaintiffs had presented evidence of damages. The court indicated that the damage inquiry was separate from the liability inquiry and suggested that plaintiffs had to establish the amount of loss caused by defendants' wrongdoing to recover damages, although they had a "more relaxed burden of proof." *Id.* at 759. The court cited with approval a dissenting opinion by Justice Thomas, *id.*, in which he explained,

> Proximate cause and certainty of damages, while both related to the plaintiff's responsibility to prove that the amount of damages he seeks is fairly attributable to the defendant, are distinct requirements for recovery in tort. That is, to recover, a plaintiff must show both that his injury is sufficiently connected to the tort that the moral judgment and practical sense of mankind [will] recognize responsibility in the domain of morals, and that the specific pecuniary advantages, the loss of which is alleged as damages, would have resulted, and, therefore, that the act complained of prevented them.

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 466–67 (2006) (Thomas, J., concurring in part and dissenting in part) (internal quotation marks and citations omitted). These cases support the proposition that the liability and damages analyses are distinct, although they also suggest that plaintiffs have a lower burden of proof with respect to tort damages, and "speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." *BCS Servs., Inc.*, 637 F.3d at 759 (internal

quotation marks omitted).

The Court concludes that even if the jury instruction on damages was incorrect, the error did not affect defendants' substantial rights. The question of what would have happened had Johnston not promised to pay is premised on speculation. Contrary to defendants' assertion, the jury heard evidence from which it could have concluded that Blagojevich would not have signed the Act without the promise of a campaign contribution. In other words, the jury could reasonably have concluded that defendants' actions caused all of plaintiffs' losses—or at the very least that there was uncertainty as to the loss amount, which reasonably could be resolved against defendants. Specifically, plaintiffs presented evidence that Blagojevich was willing to change his views on matters of state policy when constituents did not make the contributions he sought. 12/3/2014 Tr. at 448–50. Thus, even though Monk testified that he thought Blagojevich would sign the bill even without a contribution, the jury nonetheless could have concluded that Blagojevich would have vetoed it. 12/4/2014 Tr. at 799. Finally, the fact that the 2008 Act passed by a veto-proof majority is not dispositive, as "[i]t cannot be assumed that a veto-proof majority will hold in the face of an executive veto." *Empress Casino*, 763 F.3d at 732. Based on this evidence, defendants cannot show that their substantial rights were affected by the jury instruction or that the damage award resulted in a miscarriage of justice or shocks the conscience.

### 5. Amount of the damage award

Defendants argue that they are entitled to a remittitur because the damage award is excessive. A court may vacate a jury's verdict for excessiveness only if it is monstrously excessive or the evidence and verdict are not rationally connected. *See*

*Installation Servs., Inc. v. Elecs. Research, Inc.*, No. 04 C 6906, 2006 WL 3497288, at *4 (N.D. Ill. Nov. 30, 2006). The jury awarded $26 million as compensatory damages, which corresponded to the amount the casinos paid in taxes under the statute. 12/5/2014 Tr. at 929. After trial, the damage award was trebled as required under RICO. 18 U.S.C. § 1964. Defendants argue that the award is excessive because the horse tracks only kept forty percent of the proceeds from the tax, and the other sixty percent was transferred to a fund for the horsemen under the law.

Defendants' argument lacks merit. Unlike damages for unjust enrichment, compensatory damages are measured by the amount the plaintiffs lost, not the benefit defendants gained. *See* Restatement (Second) of Torts § 903 (1979). As the Court instructed, compensatory damages reflect "the amount of money that will fairly compensate plaintiffs for any loss to their business or property that you find was proximately caused by the conspiracy to violate the RICO law, which is the first claim, and/or the civil conspiracy in violation of Illinois law, which is the second claim." 12/8/2014 Tr. at 1094. The jury reasonably could have concluded that the appropriate damage award was $26 million because defendants' actions deprived the plaintiffs of the entire amount they paid in taxes.

Moreover, the jury reasonably could have concluded that even though the race tracks only retained forty percent of the tax proceeds, they benefited from the increased payments to the horsemen, because higher purses would lead to better races and therefore higher bets and attendance at the race tracks. In sum, the jury's verdict was not monstrously excessive or unconnected to the evidence.

**Conclusion**

For the foregoing reasons, the Court denies defendants' motion for judgment as a matter of law and for a new trial [dkt. no. 341].

Date:  July 10, 2015